IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROGER C. BYER, | ) | 4:17CV3160 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| ROBERT L. WILKIE, Secretary of the | ) | |
| United States Department of Veterans | ) | |
| Affairs, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. INTRODUCTION

Plaintiff, Roger Byer ("Byer"), an employee of the United States Department of Veterans Affairs ("VA"), claims he was discriminated against on the basis of his age, sex, and disability, and further claims the VA retaliated against him after he filed a complaint of discrimination. Defendant, Robert L. Wilkie, in his official capacity as VA Secretary,[1] has filed a motion for summary judgment with respect to all claims (Filing 33).

### A. Claim I (Age Discrimination)

As alleged in Byer's amended complaint, the age discrimination claim is brought under the Age Discrimination in Employment Act ("ADEA"). (Filing 8, pp. 1, 9-10) Although both parties refer the court to 29 U.S.C. § 623(a)(1), which declares that "[i]t shall be unlawful for an employer ... to ... discriminate against any individual with respect to his

---

[1] *See* 42 U.S.C. § 2000e-16(c) (providing that proper defendant in Title VII action brought by federal employee is "the head of the department, agency, or unit"); 29 U.S.C. § 794a(a)(1) (Rehabilitation Act provision incorporating § 2000e-16 by reference); *Ellis v. U.S. Postal Serv.*, 784 F.2d 835, 838 (7th Cir. 1986) (applying § 2000e-16(c) to ADEA action). *See also Hamilton v. Nicholson*, No. 8:03CV443, 2007 WL 1290132, at *3 (D. Neb. Mar. 12, 2007) (only proper defendant in action brought by VA employee under Title VII, Rehabilitation Act, and ADEA was VA Secretary).

compensation, terms, conditions, or privileges of employment, because of such individual's age," the United States is not an "employer" as defined by the Act. *See* 29 U.S.C. § 630(b) (stating that the term "does not include the United States"). The applicable ADEA provision is this case, rather, is 29 U.S.C. § 633a(a),[2] which provides that "[a]ll personnel actions affecting employees ... who are at least 40 years of age ... in [federal] executive agencies ... shall be made free from any discrimination based on age."

As set forth in the parties' Rule 26(f) planning conference report, Byer bases his age discrimination claim on the following factual allegations:

> Mr. Byer is over 62 years of age. For years, he performed at or above a satisfactory level. He was hyper-monitored by his supervisor, issued a "cease and desist letter" concerning his contact with co-employees, criticized for his "perfectionist" attitude, and targeted by his supervisor for menial, non-substantive administrative issues. In addition, Mr. Byer's supervisor instigated a conflict between Mr. Byer and Rebecca Luther, which the individuals were able to resolve by bypassing their supervisor and speaking to one another without supervisory input. Mr. Byer suffered on the job stress, pressure, and anxiety to such a degree that he required medical attention and was ordered to take leave from his job on repeated, extended occasions.

(Filing 13, pp. 2-3)

### B. Claim II (Sex Discrimination)

As alleged in Byer's amended complaint, the sex discrimination claim is brought under Title VII of the Civil Rights Act of 1964 (as amended by the Equal Employment Opportunity Act of 1972). (Filing 8, pp. 1, 11-12) Although both parties refer the court to 42 U.S.C. § 2000e-2(a), which declares that "[i]t shall be unlawful for an employer ... to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex," the United States is not an

---

[2] As originally enacted in 1967, the ADEA covered only private-sector employees. P.L. 90-202, § 11(b), 81 Stat. 602. In passing the Fair Labor Standards Amendments of 1974, P.L. 93-259, § 28(b)(2), 88 Stat. 74, Congress extended the Act's protection to federal employees. Section 663a is patterned directly after Title VII's federal-sector provision. *See Lehman v. Nakshian*, 453 U.S. 156, 163 (1981).

"employer" as defined by the Act. *See* 42 U.S.C. § 2000e(b) (stating that the term "does not include ... the United States"). Instead, the applicable statute is 42 U.S.C. § 2000e-16(a), which provides that "[a]ll personnel actions affecting employees ... in [federal] executive agencies ... shall be made free from any discrimination based on ... sex ...."

Byer's amended complaint also includes a request for an award of damages under Neb. Rev. Stat. § 48-1119(4) for the alleged sex discrimination. (Filing 8, p. 12, ¶ 50) This provision of the Nebraska Fair Employment Practice Act ("NFEPA") has no application in this case. *See* Neb. Rev. Stat. § 48-1102 (stating that the term "employer" shall not include the United States).

As set forth in the parties' Rule 26(f) planning conference report, Byer bases his sex discrimination claim on the following factual allegations:

> Mr. Byer is male and was supervised by females. Despite exemplary performance for several years, his new female supervisor evaluated his performance far below his standard level. For years, he performed at or above a satisfactory level. Other female co-workers were not subjected to the same hyper-monitoring and surveillance, were not disciplined for talking to other co-workers, were not required to travel as frequently as Mr. Byer. Mr. Byer suffered on the job stress, pressure, and anxiety to such a degree that he required medical attention and was ordered to take leave from his job on repeated, extended occasions.

(Filing 13, p. 2)

## C. Claim III (Disability Discrimination)

As alleged in Byer's amended complaint, the disability discrimination claim is brought under the Rehabilitation Act of 1973. (Filing 8, pp. 1, 12-13) The Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, ... be subjected to discrimination ... under any program or activity conducted by any Executive agency [of the United States]." 29 U.S.C. § 794(a). The Rehabilitation Act incorporates the standards of the Americans with Disabilities Act of 1990 ("ADA") to determine whether a violation has occurred. *See* 29 U.S.C. § 794(d).

Byer's amended complaint also includes a request for an award of damages under Neb. Rev. Stat. § 48-1119(4) for the alleged disability discrimination. (Filing 8, p. 13, ¶ 55) Again, however, the NFEPA does not apply to Byer's federal employment discrimination claims.

As set forth in the parties' Rule 26(f) planning conference report, Byer bases his disability discrimination claim on the following factual allegations:

> Mr. Byer has 100% service rated disability, which includes a ventral hernia, PTSD, severe anxiety disorder, and traumatic brain injury. Ms. Byer disclosed and discussed his disabilities with his supervisor. Despite this knowledge, she required Mr. Byer to participate in a meeting that he advised her was the type of confrontation that triggered his PTSD. He had no prior warning of the confrontational nature of the meeting and his supervisor failed to control the attacks on Mr. Byer despite her knowledge of his disability. He followed his supervisor's directions that same day when asked to deliver files to his co-workers after work, despite being informed the co-workers were "out to get him." Mr. Byer was physically and emotionally broken by the time the day was over. He broke down into tears and had to seek medical help the following morning. Mr. Byer's medical provider ordered Mr. Byer not to work under the conditions at the VA for six-months but Mr. Byer was only able to secure six weeks leave. His leave was misclassified but his supervisor deemed that fact insignificant. He was assigned additional travel on his return, and he also had work to complete that accrued during his absence. He requested an option of telecommuting and his supervisor flatly rejected the idea stating it would "never happen."

> Also, on his return, Mr. Byer learned his supervisor failed to investigate the conflicts he experienced with co-worker Rebecca Luther. Although his supervisor found these conflicts sufficient to put in place a "cease and desist" order, she informed Mr. Byer she did not have sufficient information to investigate. His supervisor regularly held meetings with Mr. Byer in which she repeatedly informed him that no one wanted to work with him, associate with him, or even talk to him. Again, he required medical attention and was ordered to take leave from his job on repeated, extended occasions.

(Filing 13, pp. 3-4)

## D. Claim IV (Retaliation)

A federal employee who is a victim of retaliation due to the filing of a complaint of age discrimination may assert a claim under the federal-sector provision of the ADEA. *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008).

In 1972, Congress extended the protections of Title VII to employees of the federal government and specified that "[t]he provisions of section 2000e-5(f) through (k) of [Title VII], as applicable, shall govern civil actions brought hereunder" by federal employees. 42 U.S.C. § 2000e-16(d). This federal-sector provision does not expressly incorporate Title VII's anti-relation provision, 42 U.S.C. § 2000e-3(a), but "does incorporate a remedial provision, § 2000e-5(g)(2)(A), which authorizes relief for a violation of § 2000-3(a)." *Gomez-Perez*, 553 U.S. at 487-8 & n. 4 (acknowledging, without deciding, question of "whether Title VII bans retaliation in federal employment").

Under Eighth Circuit precedent, retaliation claims under the Rehabilitation Act and the ADA are treated interchangeably. *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (but noting that "the textual basis for the claim is not well explained in our cases") The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

Byer's amended complaint also cites the NFEPA as authority for a retaliation claim (Filing 8, pp. 13, 15), but, as already discussed, that state law does not apply here.

As set forth in the parties' Rule 26(f) planning conference report, Byer bases his retaliation claim on the following factual allegations:

> Mr. Byer informed VA management he wanted to (and then did) file a discrimination and/or harassment charge against his co-worker, Luther. He was subjected to repeated and ongoing counseling sessions, given a performance improvement plan for the first time in his career, and issued a cease and desist order. No other employee at the VA was treated in this manner: being targeted by management for confronting management on the charged issues, and then

filing a charge against the VA for its continual and ongoing discrimination and harassment. In fact, both the union president and Steele-Lufcy encouraged Mr. Byer to file an EEOC charge. When Mr. Byer filed an EEOC charge against Luther, the VA retaliated. His supervisor at the VA gave him a written warning on July 26, followed by a cease and desist order on July 29. 2016. No other employee has been issued a cease and desist order. The cease and desist order was in immediate response by Steele-Lufcy as soon as Mr. Byer questioned her about the identical comments she made to both Luther and Mr. Byer about their presence in the workplace.

(Filing 13, p. 4)

### E. Defendant's Position

Defendant contends "Byer cannot establish a prima facie case of either discrimination or retaliation because he cannot establish that he suffered an adverse action" and, moreover, "[e]ven if Byer could meet his burden, Defendant had legitimate, nondiscriminatory business reasons for all actions it took regarding Byer and Byer cannot establish pretext." (Filing 35, pp. 1-2)

### F. The Court's Determination

After careful consideration of the parties' pleadings (Filings 8, 11), briefs (Filings 35, 38, 40), and evidentiary materials (Filings 34, 37), the court finds there is no genuine issue of material fact, and concludes Defendant's motion for summary judgment should be granted in its entirety. The court therefore will dismiss Plaintiff's action with prejudice and enter final judgment.

### II. STATEMENT OF FACTS

Under the court's local rules, "[t]he moving party must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). "The statement of facts should consist of short numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support

the material facts." NECivR 56.1(a)(2) (underling in original); *see* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, ....").

"The party opposing a summary judgment motion must include in its brief a concise response to the moving party's statement of material facts. Each material fact in the response ... must include pinpoint references to [evidentiary materials] upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed." NECivR 56.1(b)(1); *see* Fed. R. Civ. P. 56(c)(1). "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1) (underlining in original); *see* Fed. R. Civ. P. 56(e)(2) ("If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ....").

In this case, Defendant's brief includes a 94-paragraph statement of material facts (hereinafter designated by paragraph number as "SMF #"). (Filing 35, pp. 2-22) Byer has responded to each numbered paragraph. (Filing 38, pp. 1-36)

Pursuant to Federal Rule of Civil Procedure 56, the court finds that the following material facts are supported by the record and are not genuinely in dispute:

## A. Background/Chain of Command

1. At all relevant times, Byer was an Employment Coordinator (GS-12) with the Department of Veterans Affairs Regional Office ("VA"), Veterans Benefits Administration, Vocational Rehabilitation and Employment ("VR&E") Division located in Lincoln, Nebraska. (Filing 8, p. 2, ¶ 7; Filing 34-1, Steele-Lufcy Decl. ¶¶ 3, 14).

2. Byer was born in 1955. (Filing 8, p. 1, ¶ 2).

3. Byer is a veteran and alleges he has a 100% service-connected disability. He further claims that he suffers from Post-Traumatic Stress Disorder ("PTSD"), depression, and anxiety and has been diagnosed with ventral hernia, as well as back, knee and shoulder

disabilities. He states that he is able to perform his job with minimal accommodations. (Filing 8, p. 2, ¶ 8).

4. The Vocational Rehabilitation and Employment ("VR&E") Division assists Service members and Veterans with service-connected disabilities to prepare for, obtain, and maintain suitable employment; start their own business; or receive independent-living services. VR&E assists with job training, employment accommodations, resume development, and job seeking skills. Additionally, VR&E provides services to assist Veterans and Service members in starting their own businesses or independent living services for those who are severely disabled and unable to work in traditional employment. (Filing 34-1, Steele-Lufcy Decl. ¶ 9).

5. During the relevant timeframe, the VR&E Division in Lincoln consisted of a Vocational Rehabilitation Employment Officer (GS-13), a Program Analyst (GS-12), six Vocational Rehabilitation Counselors (GS-12) ("Counselors"), an Employment Coordinator (GS-12), and a Program Support Assistant (GS-6). (Filing 34-1, Steele-Lufcy Decl. ¶ 10).[3]

6. Melissa Steele-Lufcy was the Vocational Rehabilitation Employment Officer and Byer's immediate supervisor during the relevant timeframe. Supervisor Steele-Lufcy oversaw the Employment Coordinator and the Counselors. Supervisor Steele-Lufcy is a female. She was born in 1968, and she is disabled. (Filing 34-1, Steele-Lufcy Decl. ¶¶ 3, 6, 8).[4]

7. Jason Rogers was the Assistant Director of the Lincoln Regional Office. He was Ms. Steele-Lufcy's direct supervisor and he had oversight over the VR&E Division. (Filing 34-1, Steele-Lufcy Decl. ¶ 7).

---

[3] Byer "does not dispute these statistics," but states they are "irrelevant to his claims based on disability, sex, age, and retaliation." (Filing 38, p. 2) To the extent this statement is intended as a relevancy objection, it is overruled.

[4] In response, Byer states that Steele-Lufcy is 13 years younger than Byer. (Filing 38, p. 3) Defendant does not dispute this fact. (Filing 40, p. 3) The remainder of Byer's response is argumentative, and not facts that are supported as required by NECivR 56.1(b)(1).

8. The six Counselors were all females and younger than Byer. In 2016, four of the Counselors were over forty years of age. Three of these Counselors were born in 1956 or 1958. (Filing 34-1, Steele-Lufcy Decl ¶ 11).

9. The VR&E employees worked out of offices in Lincoln, Omaha, Bellevue and Sidney, Nebraska. (Filing 34-1, Steele-Lufcy Decl. ¶ 12). During the relevant timeframe, Byer worked in the Omaha office on Monday, Wednesday, and Friday and in the Lincoln Office on Tuesday and Thursday. This rotation allowed Byer to meet with the Counselors, to conduct orientation sessions for Veterans, and to meet with Veterans and employers in both locations. (Filing 34-1, Steele-Lufcy Decl. ¶ 16).

10. As the Employment Coordinator, Byer's responsibilities included collaborating with Counselors to determine job readiness of Veterans, providing employment case management services to job-ready Veterans, calculating and processing employment adjustment allowance (EAA) payments for eligible Veterans, conducting preliminary on-site visits and analysis of employers' work environments, working with potential employers to establish workforce strategies that include career-suitable employment of Veterans, and conducting labor market research. Byer identified and partnered with potential employers within Nebraska to train and hire Veterans. He participated in job fairs to promote the hiring of Veterans. Byer was also responsible for assisting employers with implementing reasonable accommodations and establishing employment policies for veterans with serious employment handicaps. (Filing 34-1, Steele-Lufcy Decl. ¶ 15 & Attch A).[5]

11. The Counselors provided a wide range of rehabilitation and personal adjustment counseling and case management services, including coordination of rehabilitation, training, and employment services to disabled Veterans. Counselors assessed data from medical, psychological, and vocational evaluations and developed individualized rehabilitation and employment plans to assist Veterans to prepare for and obtain suitable employment commensurate with their interests, aptitudes, and abilities. Once the Counselors developed

_____

[5] Byer disputes SMF 10, stating "he testified in his deposition that he had not seen the position description and was not familiar with its contents." (Filing 38, p. 4). Defendant has properly authenticated the position description through the declaration of Steele-Lufcy. Byer's deposition testimony does not create a genuine issue of material fact.

a plan of services and the basic rehabilitation and training services with the Veteran were completed, the Veteran progressed from training status and moved on to Job Ready Status. (Filing 34-1, Steele-Lufcy Decl. ¶ 20).[6]

---

[6] Byer does not specifically dispute SMF 11, which is deemed admitted. Byer's response reads as follows:

Mr. Byer summarized the vocational counselor responsibilities based on his experience with counselors, stating they work with

the veterans after the orientation is conducted, to review their career scope assessments, their rehabilitation needs, inventory, to get a full snapshot of where the veteran is and to try to develop a plan for a successful outcome. They should not be allowing a veteran to go in a direction that has a potential to exasperate their service-connected disability. And so once they get them in a plan of services, then they work with the veteran to the duration of what their plan is to get them to where they come to where they're job ready, and then at that point, that's where I start working with them all together to go through for a successful outcome. That's kind of a shortened version of it.

(Byer Dep. 41:1-116.) Further, as to "job ready" status, employment Counselors alone do not make the decision as to whether a veteran is "job ready." (Byer Dep. 54:13-55:11.) The Counselors in 2016 presented files to Mr. Byer to review for job readiness and he would address any questions or concerns at that point. If the file was missing documentation, plans were outdated, or Mr. Byer spotted other issues, the file was sent back to or remained with the Counselor.

The determination of "job ready" status in 2016 was a subject of controversy. Mr. Byer demanded Counselors present him with veterans and files that satisfied administrative rules and regulations. (Byer Dep. 55:15-58:9.) Mr. Byer would not accept cases from the Counselors if the files did not comply with regulations; Counselors pushed back.

Q    And the counselors felt that they had completed the case files, but you didn't think so?
A    Well, they weren't completed. There was no thinking. It was pretty clear that they were not within standard.

12. Once a Veteran was determined to have reached Job Ready Status, Byer took over the Veteran's file from the Counselor with the case transferred both physically and electronically to Byer's caseload. Byer then provided employment services and assisted the Veteran in either finding a job or maintaining the job he/she had obtained. Byer also authorized monthly Employment Adjustment Allowance payments (EAA payments) to the Veteran to provide some financial assistance during the transition from training services to job search services. The calculation and scheduling of the EAA payments was a significant portion of Byer's daily job duties. (Filing 34-1, Steele-Lufcy Decl. ¶ 21).[7]

_____

(Byer Dep. 58:4-9.) A check list was developed, with significant input by Mr. Byer, to guide the Counselors in satisfying the requirements for "job ready" status. The checklist was implemented as policy and adopted as a standard operating policy for the Lincoln Service Center. Byer Dep. 63:3-65:10.)

(Filing 38, pp. 5-6)

[7] Byer disputes SMF 12 by stating that his "job duties *included* EAA payments but that was not a significant portion of his duties." (Filing 38, p. 6 (emphasis in original)) By way of further response, Byer states "[h]e was responsible for counseling and scheduling, reviewing, and preparing the veterans for appointments," and references s portion of his deposition testimony (Byer Dep. 35:3-24):

> On Fridays and Mondays, I will call the veterans and remind them of their appointments. I also e-mail them reminding them of their appointments. I do both. When I'm following up with the veterans for employment adjusted allowance payments, I call them and I talk to them. I sometimes go out and I meet them. I have met them on Offutt Air Force Base to get paperwork and things from them, and then Tuesdays I do orientations In Lincoln. So I always meet the veterans there and give them an overview of veterans – what the Veterans Affairs is, and what the voc. rehab program is. They watch an 18-minute video, and then I do a PowerPoint that covers the video, and then they go with their counselor. On Wednesdays I do the same down at the Zorinsky Federal Building.
> And Thursday I go down to Lincoln to cover – Actually, I transport goods from Zorinsky down and I talk to veterans there, and then I get my stuff prepared for Friday and Monday.

(Filing 38, pp. 6-7) This testimony does not directly contradict Steele-Lufcy's statement that EAA payments were "a significant portion of Byer's daily job duties."

13. From at least June 2013, the Counselors and Byer frequently disagreed on whether a Veteran had reached Job Ready Status. Byer frequently told Supervisor Steele-Lufcy that several of the Counselors had not completed all the paperwork or case management steps necessary for job readiness declaration and case transfer. The Counselors told Supervisor Steele-Lufcy that Byer only accepted cases to Job Ready Status where the Veteran had already secured employment and he would not accept any cases that required him to assist the Veteran with job search activities. According to the Counselors, Byer blocked them from declaring the Veteran job ready and transferring a case to Byer. This disagreement directly affected performance measures for the Counselors. (Filing 34-1, Steele-Lufcy Decl. ¶ 22).[8]

14. During the relevant timeframe, VR&E had a Standard Operating Procedure (SOP) for processing cases for job readiness assessment and employment services. The SOP provided instruction and procedure for reviewing cases for Job Ready Assessment, preparing cases for Job Ready Declaration, staffing cases between the Counselors and Byer for Job Ready Status, and relating to Veterans participating in the program. (Filing 34-1, Steele-Lufcy Decl. ¶ 23 & Attch. B). The VR&E Division also developed a Case Management Checklist to identify specific requirements for the Counselors and Byer to complete a Veteran file for Job Ready Status. (Filing 34-1, Steele-Lufcy Decl. ¶ 24).[9]

---

[8] Byer disputes SMF 13, but his response does not create a genuine issue of material fact. Byer states:

> Neither Mr. Byer nor the rehab counselors independently determine whether a veteran is job ready. (Byer Dep. 52:10-22.) When Mr. Byer received a Counselor's file on a veteran and found the file missing documentation, based on outdated plans and missing other data, he could not move forward with the veteran. (Byer Dep. 55:21-56:3.) At that point, Mr. Byer learned the counselor[s] were calling their union to report Mr. Byer. (Id. at 56:3-7.)

(Filing 38, p. 8)

[9] Byer disputes SMF 14 by stating that "the Government's use of the phrase '[d]uring the relevant time frame' is not helpful or material, as the Government never defines that phrase." (Filing 38, p. 8) To the extent this statement is intended as an objection, it is overruled. Byer further states:

> In fact, Mr. Byer was originally responsible for developing the checklist

15. [Generally speaking],[10] the Counselor prepared the case file using the Case Management Checklist and other supporting documents to show that the Veteran had reached Job Ready Status. The Counselor and Byer discussed the case file information and the Counselor's determination of the Veteran's readiness to enter into Job Ready Status. Byer would agree or disagree with the Counselor's determination and they discussed issues that needed to be remedied in order for the Veteran to proceed to Job Ready Status. If additional actions were needed, the Counselor and Byer met again to determine readiness to move into the Job Ready Status after the needed actions were remedied. If at any time the Counselor and Byer were unable to come to an agreement on job readiness, Steele-Lufcy reviewed the case with the Counselor and Byer and made a final determination of Job Readiness. (Filing 34-1, Steele-Lufcy Decl. ¶ 25 & Attch. B).

---

because of the Counselor's failures to present him with veterans who were, in fact, job ready. My Byer originally presented a draft of the checklist to the union. He developed the checklist as follows:

> I went to the regulations and copied what I saw in the regulations, what needed to – what follow – what – Because M28R gives examples, or not examples, but gives specifications of what's needed and whether to go forth, and I also went to some other website that state vocational counselors and things I believe to put things together to come up to cover your bases for job readiness

(Byer Dep. 60:1-9.) Mr. Byer's supervisor spoke to the counselors and coordinators about the standard operating procedure and checklist. (Byer Dep. 63:20-64:22.)

(Filing 40, pp. 8-9) It is undisputed that Byer was part of the VR&E Division. (SMF 1)

[10] Defendant's SMF 15 uses the introductory clause, "As is relevant to this case." (Filing 35, p. 6) Byer objects that he "cannot tell whether a particular Counselor is being referenced plus he cannot determine which 'case file' is being referenced." (Filing 38, p. 9) Defendant responds that Steele-Lufcy "was not referencing one specific case," but "was simply describing the general process for presentation and approval of a 'job ready' status determination." (Filing 40, p. 4) With that understanding, Byer's objection is overruled. For clarity, the court has altered the introductory clause accordingly.

## B. April 28, 2016 Team Meeting

16. The VR&E Division held monthly training sessions to meet the required National and Local elective training curriculum requirements. Supervisor Steele-Lufcy determined the training topics with input from all staff members in the Division. (Filing 34-1, Steele-Lufcy Decl. ¶ 30).[11]

17. On April 28, 2016, a Training Meeting was held for the purpose of training the entire Division. All of the Division attended in person except Counselor Nelson, who attended by telephone. Part of that training was on general changes to VR&E policies and standard practices relevant to the entire Division, and part of the meeting was for training relevant to just the Counselors. Supervisor Steele-Lufcy planned to use the meeting to improve the employees' ability to work together and get along as team members, because the employees had recent issues maintaining effective and professional communications between staff members and toward Supervisor Steele-Lufcy. At the end of the agenda, there was time for the employees to raise other ad hoc issues as they thought necessary. (Filing 34-1, Steele-Lufcy Decl. ¶ 31).[12]

18. After the general training was complete, Byer asked to be excused so he could complete work on the employment services cases. Since the remaining portion of the discussion focused on the Counselors' work duties, Supervisor Steele-Lufcy agreed to his request. (Filing 34-1, Steele-Lufcy Decl. ¶ 32).[13]

---

[11] Byer does not dispute SMF 16, but states it is not material. (Filing 38, p. 10) To the extent this statement is intended as a relevancy objection, it is overruled.

[12] Byer "objects to SMF 17 because SMF 17 is comprised of an entire paragraph of multiple sentences, contrary to this District's rules on summary judgment. NECivR. 56.1 (a)(1),(2)." (Filing 38, p. 10) This objection is overruled. The local rule calls for short paragraphs, not necessarily single sentences. Byer makes the same objection with respect SMF's 19, 29, 67, 71, 76, 77, 85, and 86. (Filing 38, pp. 11, 15, 28, 33-34). Those objections are likewise overruled.

[13] Byer does not dispute the first sentence, and "agrees he requested and was granted permission to leave the training session to work on case closures he needed to complete." (Byer Dep. 99:7-14.)" (Filing 38, p. 10). Because Byer has not presented any facts in refutation of the second sentence, it is deemed admitted. "Defendant does not dispute the

19. At the end of the counselor training, Counselor Rebecca Luther raised a new issue. She was concerned with Byer returning files to her and disagreeing with her on whether a Veteran should be transferred to Job Ready Status. Ms. Luther thought her files were complete and the Veterans had reached Job Ready Status, so the files should be passed on to Byer for his employment services. Other Counselors generally agreed with Ms. Luther and wanted to discuss the issue further as well. Supervisor Steele Lufcy stated that this discussion could not occur without the presence and input of Byer. The group asked to have Byer rejoin the group meeting so that the topic could be discussed by all parties at this time instead of waiting until the next monthly meeting. (Filing 34-1, Steele-Lufcy Decl. ¶ 33).[14]

20. Supervisor Steele-Lufcy asked Byer to return to the meeting so that the issue could be discussed by the entire group. Byer said would prefer not to come to the group and said he needed to be prepared before being asked to discuss work topics. Supervisor Steele-Lufcy requested Byer rejoin the group and he agreed. (Filing 34-1, Steele-Lufcy Decl. ¶ 34).[15]

21. Byer was frustrated when he returned to the room. Supervisor Steele-Lufcy opened the discussion by stating that the staff wanted to review the process for declaring a Veteran's case as Job Ready and transferring the case to Byer. (Filing 34-1, Steele-Lufcy Decl. ¶ 35).[16]

---

additional facts offered by Byer in response to SMF 18." (Filing 40, p. 4)

[14] Byer responds that he "was not present, and the Counselors attacked his well-known dedication to holding himself and his co-workers to the required rules and regulations for determining job ready status." (Filing 38, p. 11) Because no evidence is cited in support of this statement, it will not be considered. *See* NECivR 56.1(b)(1); Fed. R. Civ. P. 56(c)(1).

[15] Byer disputes SMF 20, stating he "had no option but to return to the meeting as directed by Supervisor Steele-Lufcy," and "had previously disclosed precisely how such situations impacted him." (Filing 38, p. 11) (citing his deposition testimony: "Because I had shared about how I could not handle tense situations, loud noises, and being put under scrutiny, and in sharing those, it seemed like everything was used in that perspective of the things that really annoyed me to make me feel bad or ashamed or feel not a part of." (Byer Dep. 232:16-22)). These statements do not create a genuine issue of material fact.

[16] Byer disputes SMF 21, stating: "Steele-Lufcy did not re-open the meeting, Rebecca Luther took control when Mr. Byer returned. She was loud; she leaned in toward Mr. Byer

22. Ms. Luther began to discuss the files and her concerns with Byer returning the files to her as incomplete. (Filing 34-1, Steele-Lufcy Decl. ¶ 35). Ms. Luther brought up the work environment and the services provided to the Veterans. (Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 105:25 - 106:15). Ms. Luther and Byer were several feet apart. Ms. Luther did not swear, nor did she refer to Byer's sex, age, or disability. (Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 108:22 - 109:20).[17]

23. The discussion quickly became heated between Byer and Ms. Luther, and Byer had difficulty maintaining his composure. (Filing 34-1, Steele-Lufcy Decl. ¶ 35; Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 100:1-5; 105:15-24).[18]

---

when she shouted at him. No other counselors spoke up nor did Steele-Lufcy. (Byer Dep. 107:6-12.)" (Filing 38, p. 12) The cited deposition testimony only supports Byer's statement that other counselors and Steele-Lufcy did not "speak up" at the meeting. SMF 21 therefore is deemed admitted.

[17] Byer "disputes the Government's characterization of Luther's confrontation of and personal attack on Mr. Byer when Steele-Lufcy returned him to the general meeting," and states: "Luther did not simply begin discussing the Job Ready process; she raised her voice, hands on hips, and verbally launched into Mr. Byer, making him feel 'intimidated, anxious' and as if he was 'being put on display in front of her co-workers to belittle' Mr. Byer. (Byer Dep. [107]:19-108:12.)" (Filing 38, p. 12) However, Byer testified Luther "started to talk about moving cases" before raising her voice, which caused Byer to raise his voice in defense. (Filing 37-2, p. 27 (Byer Dep. 105:15-24)) Byer could not remember what Luther was talking about, except that "[i]t was about the work environment and the veterans." (*Id.* (Byer Dep. 105:25-106:15)) Byer also states, without citing any supporting evidence, that "Steele-Lufcy was present but did nothing to control the situation." (Filing 38, p. 12) Byer's statements do not create a genuine issue of material fact.

[18] "Byer agrees that he was unable to maintain his composure in the face of Luther's shouting." (Filing 38, p. 12) He states: "Before returning to the meeting, Mr. Byer told Steele- Lufcy he was not prepared to return to the group, he needed to know what was on the agenda, so he was not unprepared. (Buyer Dep. 99:18-100:8.) Mr. Byer did not explode or engage in violent act – he started crying. (Byer Dep. 274:7-14)" (Filing 38, pp. 12-13) These statements do not create a genuine issue of material fact.

24. After a few minutes, Byer left the room. (Filing 34-1, Steele-Lufcy Decl. ¶ 35; Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 101:3-8, 106:25-107:4).[19]

25. A few minutes later, Byer returned to the meeting after he composed himself, and the meeting finished shortly thereafter. (Filing 34-1, Steele-Lufcy Decl. ¶ 36; Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 100:5-8, 109:23 - 110:17).

26. Supervisor Steele-Lufcy did not make any comments that were disparaging, derogatory, humiliating or "making fun" of Byer. (Filing 34-1, Steele-Lufcy Decl. ¶ 37).[20]

27. Byer told Supervisor Steele-Lufcy after the meeting that he felt uncomfortable in the meeting. Supervisor Steele-Lufcy admitted that her attempt at team building did not result in a successful discussion of an expressed group issue to arrive at a group consensus. (Filing 34-1, Steele-Lufcy Decl. ¶ 38).

28. No employees, including Byer, were disciplined as a result of this meeting. This meeting did not affect their title, salary, benefits, status, or job responsibilities. (Filing 34-1, Steele-Lufcy Decl. ¶ 39).[21]

---

[19] Defendant's SMF 24 also states: "Supervisor Steele-Lufcy stated both parties needed to lower their voices, not talk over one another and listen to each other's points of view on the issue, and encouraged the discussion to be professional." (Filing 35, p. 8) This statement is effectively placed in dispute by Byer's deposition testimony that Steele-Lufcy did not "speak up" during this portion of the meeting. (See Byer's response to SMF 21) but even assuming that Steele-Lufcy did not speak up, the meeting did constitute an adverse employment action. (See SMF 28)

[20] Byer "acknowledges that Steele-Lucy did not make disparaging comments directly to Mr. Beyer." (Filing 38, p. 14) The remainder of Byer's response is argumentative and not supported by any citations to the record; therefore, it will not be considered as an opposing statement of material facts. *See* NECivR 56.1(b)(1); Fed. R. Civ. P. 56(c)(1).

[21] Byer's response to SMF 28 is argumentative and not supported by any citations to the record; therefore, it will not be considered as an opposing statement of material facts. *See* NECivR 56.1(b)(1); Fed. R. Civ. P. 56(c)(1).

## C. Classification of Byer's Leave after His Return from FMLA Leave

29. On April 29, 2016, Mr. Byer came to see Supervisor Steele-Lufcy and told her that his doctor had advised Byer not to return to work for six weeks.[22] Byer submitted a leave request and some documentation, and Supervisor Steele-Lufcy provided Byer with the forms for the Family Medical Leave Act (FMLA). Byer planned to follow up with the VA time and attendance coordinator, Scott Micek, to determine the best way to plan his leave requests. Byer wanted to take a combination of paid leave and leave without pay so that he would remain in leave accrual status as long as possible. (Filing 34-1, Steele-Lufcy Decl. ¶ 40).

30. Byer was on FMLA leave from April 29, 2016, to June 10, 2016. (Filing 34-1, Steele-Lufcy Decl. ¶ 41).

31. When Byer returned to work following his FMLA leave, he noticed his time records did not designate that the unpaid Leave Without Pay (LWOP) was pursuant to the FMLA. (Filing 34-3, Wagner Decl, Attch. A, Byer Depo. 140:2-16).

32. Byer notified Supervisor Steele-Lufcy and Human Resources of the error and the FMLA status was corrected on Byer's leave records. (Filing 34-1, Steele-Lufcy Decl. ¶ 42; Filing 34-2, Norris Decl. ¶¶ 34-35; Filing 34-3, Wagner Decl, Attch. A., Byer Depo. 140:24 -141:1).[23]

---

[22] The amended complaint (Filing 8, p. 6, ¶¶ 21-22) indicates Byer's physician recommended he take six months off of work. In his deposition, Byer testified the reference to six months was incorrect, and that his doctor instead recommended six weeks off of work. (Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 115:10-116:23).

[23] Byer disputes SMF 32, stating: "In fact, Steele-Lufcy told Mr. Byer that the leave designation 'was no big deal.' (Byer Dep. 141:18-15.) Despite her casual dismissal of the error, Mr. Byer followed up with a Human Resources representative who informed him that, 'Yes, it is a big deal.' (Byer Dep. 141:18-142:2.) Nonetheless, the only action in response to the error Mr. Beyer pointed out as to FMLA leave was taken by Mr. Byer himself and trying to get the leave designation corrected. (Byer Dep. 142:3-12.)" (Filing 38, p. 15) To the extent Defendant has raised a relevancy objection to this statement (see Filing 40, pp. 5-6), the objection is overruled. Byer's statement, however, does not refute Defendant's SMF 32.

33. Byer testified that the error in the FMLA designation did not make any difference in his case. (Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 141:2-9). There was no action taken against Byer for the lack of FMLA designation on his leave, and it did not affect the type of leave Byer used. (Filing 34-2, Norris Decl. ¶ 36; Filing 34-3, Wagner Decl, Attch. A., Byer Depo. 142:3-12).[24]

D. Required Travel after Return from FMLA Leave in June 2016

34. As the sole Employment Coordinator for Nebraska, Byer was required to travel as part of his work. (Filing 34-1, Steele-Lufcy Decl. ¶ 17 & Attch. A, pp. 1-2). Byer traveled around Nebraska for outreach activities to meet with Veterans, training facilities, and employers and disseminate information about the VA employment-related programs and services. He met with potential employers of Veterans at job fairs and other outreach activities. On a few occasions, Byer traveled to meet with an employer to negotiate a non-paid work employment readiness training opportunity for Veterans to get work experience. Byer could travel to meet with Veterans at their worksites or at common spaces out in the community. Byer rarely had overnight travel and he would receive compensatory time for day trips which required travel outside of his normal business hours. (Filing 34-1, Steele-Lufcy Decl. ¶¶ 17-18, Attch. A, pp. 1-2).[25]

---

[24] Byer disputes SMF 33 by stating that "[t]he Government only cites part of Mr. Byer's deposition testimony in support of its statement." (Filing 38, p. 16) Byer's complete answer to the question of "what difference did that [correction to the FMLA designation on his time card] make?" was as follows:

Well, in the grand scheme of things, when you look at the paperwork, it didn't make any difference, but if we was going to justify why a person was gone, if something came down to legal actions, where was he at? Leave without pay? What was he doing? Why wasn't he here? Why didn't he take leave? Why didn't he do this? FMLA would show that there was a Family Medical Leave Act that was put in because of a condition, so, therefore, you would have justification being gone with leave without pay.

(Filing 37-2, pp. 35-36 (Byer Dep. 140:24-141:17))

[25] Byer disputes SMF 34, as well as SMF's 35, 39, and 41, by citing his testimony that he "very seldom" had to travel to outreach functions until after he returned from FMLA

-19-

35. The Counselors were required to travel on an "as-needed" basis to training, for meetings with Veterans and school officials, and to coordinate purchases for the Veterans' approved training programs. Counselors were not required to travel to public informational outreach or employment related events. (Filing 34-1, Steele-Lufcy Decl. ¶ 19).

36. During Byer's FMLA absence from April 29, 2016, through June 10, 2016, Supervisor Steele-Lufcy authorized the EAA payments to the Veterans and worked with the Counselors on Byer's cases involving new Veterans, or questions for Veterans that were in the program or preparing for case closure. (Filing 34-1, Steele-Lufcy Decl. ¶ 43).[26]

37. Prior to and during Byer's absence, the National VR&E Systematic Technical Accuracy Review (STAR) Team in Nashville, Tennessee, identified fiscal errors in some of Byer's cases. Supervisor Steele-Lufcy held these cases in Byer's office awaiting his return so that he could make the required corrections, if possible given the error in question, or at least to review the fiscal errors and learn from them so as to correct his calculation errors in the future. (Filing 34-1, Steele-Lufcy Decl. ¶ 44).[27]

38. Upon Byer's return following his FMLA leave, he worked out of the Omaha and Lincoln offices, reviewing his cases and catching up on emails. He also had his normal Veteran tasks that were his usual work responsibilities. (Filing 34-1, Steele-Lufcy Decl. ¶ 45).[28]

---

leave, when "it seemed like it was all of a sudden. Go here. Go here. Go here. Get this done. Get this done. Why is this not done? Why have you not done this? It was an ongoing thing when I came back." (Filing 38, pp. 17-19 (citing Byer Dep 120:15-25)). Byer's testimony does not directly refute Defendant's statements of material facts.

[26] Byer does not dispute SMF 36, but states it is immaterial. (Filing 38, p. 18) To the extent this statement is intended as a relevancy objection, it is overruled.

[27] Byer does not dispute SMF 37, assuming that the phrase "Byer's absence" is a "reference to his period of FMLA leave from April 29, 2016 through June 10, 2016." (Filing 38, p. 18). Defendant confirms this was the intent. (Filing 40, p. 6)

[28] Byer adds that his "physician authorized and requested that the Government provide Mr. Byer with additional FMLA Leave for June 13, through June 17 so he could 'try and ease back in the work environment and the stress.'" (Filing 38, p. 18 (citing Byer Dep.

39. On July 7, 2016, Byer traveled to Kearney to complete an Outreach event as part of his job duties. This outreach was at the request of the Counselor in that service area. This travel was authorized as a day trip and Byer received compensatory time for his time outside of his regular work hours. (Filing 34-1, Steele-Lufcy Decl. ¶ 46).

40. On July 8, 2016, Byer met with a Veteran at his job site in the Omaha area early in the morning. Compensatory time was approved for Byer for his time outside of his work hours. (Filing 34-1, Steele-Lufcy Decl. ¶ 47).[29]

41. Supervisor Steele-Lufcy did not require Byer to travel when he returned from FMLA leave, except for that which was part of his job duties or of the type of travel that was required of him prior to his FMLA leave. (Filing 34-1, Steele-Lufcy Decl. ¶ 48).

42. At no time did Byer tell Supervisor Steele-Lufcy that he was unable to travel, including after he returned from his FMLA leave. His paperwork that allowed his return to work did not preclude travel. (Filing 34-1, Steele-Lufcy Decl. ¶ 49).

### E. July 8, 2016 Leave Without Pay (LWOP)

43. Leave Without Pay (LWOP) is unpaid leave and it is discretionary with the agency. LWOP must be requested by an employee. (Filing 34-2, Norris Decl. ¶ 13 & Attch. A, p. 1, ¶ 2).

44. LWOP is requested in the same manner and for the same purposes as annual leave and sick leave. LWOP may be granted even though the employee has a sick or annual leave balance. (Filing 34-2, Norris Decl. ¶ 15 & Attch. B, p. 8, Section 10(B)).

---

118:5-21)) In fact, the Government did approve additional FMLA leave for Byer for June 13 through June 17. (Filing 34-2, Norris Decl. ¶ 37)

[29] Byer does not dispute SMF 40, but states it is immaterial. (Filing 38, p. 19) To the extent this statement is intended as a relevancy objection, it is overruled.

45. Federal regulations provide that the accumulation of nonpay status hours, including LWOP, during a leave year can affect the employee's accrual of annual leave and sick leave. (Filing 34-2, Norris Decl. ¶ 19, 5 C.F.R. § 630.208(a)).

46. Byer requested and was approved for 70 hours of LWOP during the six-week absence from April 29, 2016, through June 10, 2016. He also used paid annual leave (50 hours), paid sick leave (101 hours and 15 minutes) and compensatory time (18 hours and 45 minutes). (Filing 34-1, Steele-Lufcy Decl. ¶ 41; Filing 34-2, Norris Decl. ¶ 30 & Attch D).

47. Byer continued to accrue his annual and sick leave without reduction during his 6-week absence. Mr. Byer was never in a status that he was unable to accrue leave in 2016. (Filing 34-2, Norris Decl. ¶ 40).

48. After his FMLA leave, and because he continued to earn leave, Byer had a remaining balance of 16 hours and 45 minutes of sick leave and 65 hours of annual leave available for him to use on June 13, 2016. (Filing 34-2, Norris Decl. ¶ 32).

49. On July 8, 2016, Byer took two hours of sick leave pursuant to the FMLA. (Filing 34-1, Steele-Lufcy Decl. ¶ 52 & Attch. D; Filing 34-2, Norris Decl. ¶¶ 38-39).

50. Byer did not take LWOP on July 8, 2016. (Filing 34-1, Steele-Lufcy Decl. ¶ 54; Filing 34-2, Norris Decl. Attch. D, p. 2).

51. In addition, Byer also requested and was approved for one hour of compensatory time on July 8, 2016, because he had worked with a veteran early in the day. (Filing 34-1, Steele-Lufcy Decl. ¶ 53 & Attch. E).

52. Supervisor Steele-Lufcy has not required anyone to take LWOP, but she has granted requests for LWOP from Byer and other employees when they have made such requests. (Filing 34-1, Steele-Lufcy Decl. ¶¶ 41, 50, 55 & Attch. C).

53. The VA allows employees to utilize advanced annual leave or sick leave under certain situations. (Norris Decl. ¶ 23 & Attch. A, p. 3, ¶ 5(c)(4)).

54. In order to take advanced sick leave, an employee must have exhausted all of the employee's earned sick leave. Likewise, in order to take advance annual leave, an employee must exhaust all of the employee's earned annual leave. (Filing 34-2, Norris Decl. ¶ 27).

55. At the end of Byer's six-weeks of FMLA leave, Byer still had a positive balance of earned sick leave and earned annual leave. Byer had not exhausted all of his earned leave, so he was not eligible for advanced leave. (Filing 34-2, Norris Decl. ¶¶ 32, 41).

## F. July 26, 2016 Counseling Memo

56. In 2015 and 2016, the VA utilized a National Performance Standard for Employment Coordinators and another standard for the Counselors. (Filing 34-1, Steele-Lufcy Decl. ¶ 58).

57. The National Performance Standard for Employment Coordinators set forth five critical elements (production, timeliness, quality of work, customer service, and program and data integrity) and one non-critical element (cooperation and organizational support). The National Performance Standard identified specific measures for each element, and the quantifiable results that an individual should achieve during a rating period to be fully successful. If an employee failed to meet any of the elements, the employee was required to submit compelling mitigating reasons why the element was not met and to identify additional actions to achieve the results set forth in the element. (Filing 34-1, Steele-Lufcy Decl. ¶ 59 & Attch. F).

58. Under Critical Element 3 - Quality of Work, the standard was accuracy. The National Performance Standard required the Rater [to] review at least three cases (in each quality category) for each Employment Coordinator each quarter. Fiscal Accuracy is a measure of correctness in fiscal payment computations and transactions during the rating period. The National Performance Standard specified that the standard for Fiscal Accuracy is 90 percent. (Filing 34-1, Steele-Lufcy Decl. ¶ 60 & Attch. F, p. 3).

59. Every month, the National VR&E Systematic Technical Accuracy Review (STAR) Team office in Nashville, Tennessee sent a printout of cases that were randomly selected for review to verify the fiscal transactions were processed correctly, including

payments to Veterans. Supervisor Steele-Lufcy received this list of cases targeted for review. If there were not enough case files to review for the particular element, Lisa Chellew, the VR&E Division Program Analyst, pulled additional case files from the employee at random. Program Analyst Chellew reviewed the case files and determined whether errors were present, and what policies were in effect for the particular element. She prepared a statistical analysis of the employee's files for the relevant time period when compared to the National Performance Standard. Supervisor Steele-Lufcy reviewed the sampling of each employee's files and met with each employee to discuss their performance. (Filing 34-1, Steele-Lufcy Decl. ¶ 61).

60. In 2016, Supervisor Steele-Lufcy had an individual meeting with each of the Counselors and with Byer on a weekly basis to review their cases and their performance standings. (Filing 34-1, Steele-Lufcy Decl. ¶ 62).

61. If a VR&E employee was not meeting the National Performance Standard for fiscal accuracy or other measurement, Supervisor Steele-Lufcy routinely issued a Letter of Counseling to the employee that identified their actual performance scores in relation to the required National Performance Standard scores. (Filing 34-1, Steele-Lufcy Decl. ¶ 63).

62. The Letter of Counseling was designed to help an employee demonstrate acceptable performance through expanded reviews and guidance. The Letter of Counseling is referred to as a pre-Performance Improvement Plan, or pre-PIP memo. The Letter of Counseling is not a Performance Improvement Plan (PIP). Instead, a Letter of Counseling is a preliminary step to help identify areas and issues targeted for improvement. (Filing 34-1, Steele-Lufcy Decl. ¶ 64).

63. In late April or early May 2016, Supervisor Steele-Lufcy reviewed the STAR Team list of cases and the statistical analysis through March 2016. The STAR Team identified significant accuracy errors in the case files for three of the Counselors and Byer. Supervisor Steele-Lufcy consulted with Human Resources on how to address these errors, and Human Resources recommended that Supervisor Steele-Lufcy issue Letters of Counseling to all four employees. (Filing 34-1, Steele-Lufcy Decl. ¶ 65).

64. Between May and August of 2016, Supervisor Steele-Lufcy issued Letters of Counseling to the three VR&E Counselors because their performance fell below the National Performance Standard for accuracy. In September 2016, each of these three individuals was placed on a PIP because their performance did not sufficiently improve after the Letters of Counseling. (Filing 34-1, Steele-Lufcy Decl. ¶ 66).

65. In late April or early May 2016, Supervisor Steele-Lufcy reviewed Byer's case files and determined that he fell below the Fiscal Accuracy Standard based on fiscal accuracy computation errors regarding the processing and submission of EAA payments. (Filing 34-1, Steele-Lufcy Decl. ¶ 67).

66. Since Mr. Byer was on FMLA leave from April 29, 2016, through June 10, 2016, Supervisor Steele-Lufcy consulted with Lindsey Rodysill, Human Resources Management, on when to provide the Letter of Counseling to Byer in light of his extended leave. Ms. Rodysill recommended Supervisor Steele-Lufcy wait 30 days after Byer's return to issue the Letter of Counseling. (Filing 34-1, Steele-Lufcy Decl. ¶ 68).

67. On July 14, 2016, after Byer had been back at work for 30 days, Supervisor Steele-Lufcy issued a Letter of Counseling to Byer based on his performance. The Letter of Counseling notified Byer that his Fiscal Accuracy from October 1, 2015 (the beginning of the appraisal period) through March 31, 2016 was 78.5 percent, which was 11.5 percent below the required standard of 90 percent for Fiscal Accuracy. (Filing 34-1, Steele-Lufcy Decl. ¶ 69 & Attch. G). The Letter of Warning [*sic*] notified Byer that failure to meet his standard may result in a performance based action that may include a Performance Improvement Plan. Byer was also notified that he would be given an additional 30 days to demonstrate acceptable performance in the area of Quality of Work and that to assist in getting back to his standard, he would be placed on expanded reviews to assist him in getting back to his standard. (Filing 34-1, Steele-Lufcy Decl. Attch. G, p. 2).[30]

_____

[30] Byer claims "the Government's review of his performance changed from before he took FMLA leave and after," as he testified:

> Prior to this time, there was nothing until I filed the EEOC and we went and moved forward, and when I came back, then it seemed like I was being scrutinized on everything I did. I did – Like I say, when I came on board, I was

68. In addition to the Letter of Counseling, Supervisor Steele-Lufcy met with Mr. Byer and reviewed his case files to provide additional training and oversight of his performance. (Filing 34-1, Steele-Lufcy Decl. ¶ 70).[31]

69. In July, Supervisor Steele-Lufcy reviewed more of Byer's case files, taking into consideration that he was on leave during some of this time. As of the end of June 2016, Byer's year-to-date performance was at 84.2 percent, which was 5.8 percent below the required standard for Fiscal Accuracy. Supervisor Steele-Lufcy issued a second Letter of Counseling dated July 26, 2016, to Byer, and met with Byer to review more of his case files and provide guidance on how to correct the fiscal errors, or prevent future errors from occurring. (Filing 34-1, Steele-Lufcy Decl. ¶ 71 & Attch. H).[32]

70. Byer testified that he believed his Fiscal Accuracy rate of 84.2% was accurate. (Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 186:12 - 187:2).

71. Byer's Fiscal Accuracy improved each month under Supervisor Steele-Lufcy's mentoring and guidance. Byer's Fiscal Accuracy for August 2016 was 100 percent; however, his average for the Fiscal Year to date was 88.4 percent, which was 1.6 percent under the required standard for Fiscal Accuracy. Therefore, Supervisor Steele-Lufcy issued Byer a

---

given exceptional, outstanding, outstanding, exceptional, and I had had no counseling or anything on job performance or errors or anything, and when I came back, it seemed like I was being put under a lot of scrutiny and a lot of criticism about doing things inappropriately or wrong, and it just –

(Filing 38, p. 35 (quoting Byer Dep. 177:14-25) Defendant does not dispute that Byer did not receive a Letter of Counseling until after he returned from FMLA leave. (Filing 40, p. 7)

[31] Byer disputes SMF 68 by stating he "does not recall meeting with Steele-Lufcy, other than getting a written warning from her." (Filing 38, p. 25) Because no evidence is cited in support of this statement, it will not be considered. See NECivR 56.1(b)(1); Fed. R. Civ. P. 56(c)(1).

[32] Byer testified Steele-Lufcy "was pointing out that my accuracy was still not meeting standards and that it had improved, though, and keep up the positive focus." (Filing 38, p. 26; Filing 37-2, p. 47 (Byer Dep. 187:20-23) Defendant does not dispute this additional fact. (Filing 40, p. 7)

third Letter of Counseling dated September 23, 2016, for his performance from October 1, 2015 through July 31, 2016. (Filing 34-1, Steele-Lufcy Decl. ¶ 72 & Attch. I).[33]

72. Supervisor Steele-Lufcy provided the Letter of Counseling to Byer and met with him to discuss the letter and his cases. Byer wrote on the Letter of Counseling: "Melissa has informed me [my] Fiscal Accuracy has improved, and there were no errors last month. [She] believes [I] will meet performance standards. Therefore, another month of continued monitoring should prove to be positive. Although this is difficult to accept, and I accept with hesitation, [I] do accept with anticipated positive outcome." (Filing 34-1, Steele-Lufcy Decl. ¶ 73 & Attch. I, p. 2).[34]

73. On October 25, 2016, Supervisor Steele-Lufcy reviewed additional cases assigned to Byer for Fiscal Accuracy. Byer's Fiscal Accuracy for the 4th quarter of 2016 was 100 percent, which raised his annual level of performance for Fiscal Accuracy to 91.7 percent. This met the National Performance Standard to qualify for a Fully Successful rating. (Filing 34-1, Steele-Lufcy Decl. ¶ 74).

_____

[33]In response to a question as to whether the performance notices helped him meet the performance requirement, Byer testified: "By looking at the pictures, I mean by the status, it shows I improved, but it hindered fulfillment going towards it the way it was presented, but it did help me meet the standard. So, yes, it helped." (Filing 38, p. 26; Filing 37-2 (Byer Dep. 194:1-5.)) When asked if his concern with the Letter of Counseling memo was that it "was not issued until you were back on board for 30 days," Byer testified:

> That's the first I had known that I was that far below standards, and it would have been nicer to know way back forward [sic] so we could work towards it instead of coming back after it's been (unintelligible) and having this put down and saying, You're not meeting standards and then progressive investigation, so to speak, showing I'm not meeting them. It was a lot of stress

(Filing 38, pp. 26-27; Filing 37-2, p. 49 (Byer Dep. 194:6-195:10))

[34] Byer states SMF 72 is "[u]ndisputed as to the writing on the Letter of Counseling." (Filing 38, p. 27) The remainder of SMF 72 is not specifically disputed, and is deemed admitted because no evidence to the contrary has been cited by Byer.

74. Byer was not placed on a PIP because his performance improved after he received the three Letters of Counseling. (Filing 34-1, Steele-Lufcy Decl. ¶ 75).[35]

75. The Letters of Counseling [issued] to Byer were beneficial and served their purpose because Byer's performance improved, and Supervisor Steele-Lufcy rated Byer as fully successful on his 2016 annual review. (Filing 34-1, Steele-Lufcy Decl. ¶ 76; Filing 34-3; Wagner Decl. Attch. A, Byer Depo. 187:9-23; 191:9-16; 193:18-194:5).[36]

G. July 29, 2016 - Notice to Limit Workplace Interactions with Co-worker
(Referred to by Byer as a "Cease & Desist" Letter)

76. Byer and Counselor Luther, his co-worker at the Omaha office, had a history of personality conflicts. These conflicts seemed to increase after other Omaha staff retired, or were assigned to work outside of the Omaha Zorinsky building. Byer complained to Supervisor Steele-Lufcy on multiple occasions about office interactions with Ms. Luther. Ms. Luther also complained to Supervisory Steele-Lufcy on multiple occasions that Mr. Byer was difficult to get along with. (Filing 34-1, Steele-Lufcy Decl. ¶ 77).[37]

---

[35] Byer states SMF 74 is "[u]ndisputed as to the fact that Mr. Byer was not placed on a PIP." (Filing 38, p. 28) The remainder of SMF 74 is not specifically disputed, and is deemed admitted because no evidence to the contrary has been cited by Byer.

[36] Byer disputes SMF 75 by stating that "[t]he first two portions of Mr. Byer's deposition testimony cited by the government does not address whether the documents were perceived by Mr. Byer as 'beneficial' or 'served their purpose.'" (Filing 38, p. 28) Defendant responds that SMF 75 does not concern Byer's perceptions, and suggests that inserting the word "issued" before "to Byer" would remove any ambiguity. (Filing 40, p. 8) The court accepts this suggestion and finds that SMF 75, as thus modified, is fully consistent with the cited evidence.

[37] In response to SMF's 76 and 77, Byer references two portions of his deposition testimony which do not contradict either statement of material fact. (Filing 38, pp. 28-29). Byer's testimony, preceded by counsel's questions, reads:

Q      Why, why did you have a difficult relationship with Rebecca Luther prior to July 29th, 2016?
A      Because of all the other incidents that we have previously discussed, how she would be confrontational, trying to find information out

77. Supervisor Steele-Lufcy consulted with Ms. Rodysill, Human Resources Management, on steps that she could take to resolve the conflict between Byer and Ms. Luther. (Filing 34-1, Steele-Lufcy Decl. ¶ 78). Based on that consultation, Supervisor Steele-Lufcy made repeated offers and attempts to resolve their conflicts, including:

a. The April 28, 2016, ad-hoc portion of the meeting with the entire division was an attempt to address conflicts in how the case files were handled. (Filing 34-1, Steele-Lufcy Decl. ¶ 78; Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 214:6-16).

b. Supervisor Steele-Lufcy met jointly with Byer and Ms. Luther to discuss their working relationship. (Filing 34-1, Steele-Lufcy Decl. ¶ 78; Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 214:17-25).

---

and raise her voice, and just – it was just very, very tense. And on this day –

(Filing 37-2, p. 51 (Byer Dep. 202:13-20))

> Q      And so at this point, end of July, when [Steele-Lufcy] issued the memo to you, Exhibit 27, that you and Rebecca Luther should only talk about your work-related issues. Is this a way to address the difficulties that you and Rebecca Luther were having?
> A      Based on what I know now, I would say no.
> Q      Because?
> A      Because once Rebecca and I started talking and we found out what had been said against each one of us, pitting us against one another to move on, and how everybody else was told the same thing about me and me about the and it just kind of escalated, and when she tried to have us talk, she kept on. She told her to tell me all the bad things and told me to tell her all the bad things, and when you do that, you just continue to add fuel to the fire, and it doesn't move no further.

(Filing 37-2, p. 54 (Byer Dep. 215:25- 216:21) (incorrectly cited as page 283 by Byer))

c. Supervisor Steele-Lufcy met individually with Byer and Ms. Luther to discuss her expectations for professionalism in the workplace and to resolve their conflicts with each other. (Filing 34-1, Steele-Lufcy Decl. ¶ 78).[38]

d. Supervisor Steele-Lufcy responded to emails and phone calls from Byer and Ms. Luther when they complained about actions taken by the other person. (Filing34-1, Steele-Lufcy Decl. ¶ 78).

78. Additionally, Supervisor Steele-Lufcy offered to meet with Byer and Ms. Luther on several occasions to mediate any issues between them and to improve office communications, but Byer refused to accept these meetings. (Filing 34-1, Steele-Lufcy Decl. ¶ 78 & Attch. J).[39]

79. Despite these efforts, Byer and Ms. Luther continued to report conflicts with each other. (Filing 34-1, Steele-Lufcy Decl. ¶ 78).[40]

80. Byer testified that Supervisor Steele-Lufcy attempted to resolve the conflict between Byer and Ms. Luther prior to issuing the Notices to Limit Work Place Interactions. (Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 215:19-24).[41]

---

[38] Byer disputes SMF 77c by referencing his response to SMF 76. However, the testimony referenced in SMF 76 does not contradict SMF 77c.

[39] Byer disputes the use of the term "mediate," based on the testimony which is referenced in his response to SMF 76. (Filing 38, pp. 30-31) However, that testimony does not contradict SMF 78.

[40] Byer again references the testimony cited in response to SMF 76 and claims "Steele-Lufcy was actually fueling the issues between Mr. Byer and Luther ... and pitting Luther and Mr. Byer against one another." (Filing 38, p. 31) Byer's testimony does not directly contradict SMF 79.

[41] In response, Byer cites a portion of his deposition testimony where he opines that the Notice to Limit Work Place Interactions (or "cease and desist" memo) was issued in response to the filing of his EEOC complaint about one month previously. (Filing 38, p. 31 (citing Byer Dep. 237:2-25) This testimony does not directly contradict SMF 80.

81. On July 12, 2016, Byer urgently contacted Supervisor Steele-Lufcy outside of his weekly coaching session. Byer stated that Ms. Luther came to his office and was verbally aggressive, and he was concerned that Ms. Luther would come to his door and block him in his office. Supervisor Steele-Lufcy and Byer discussed strategies that he could use to ensure that he felt safe in his office and what steps he should take if Ms. Luther approached him in his office and the conversation became inappropriate or unprofessional. (Filing 34-1, Steele-Lufcy Decl. ¶ 79 & Attch. J).

82. On or about July 22, 2016, and in emails over the next few days, Supervisor Steele-Lufcy again offered to mediate a meeting to address the conflicts between Ms. Luther and Byer, but Byer was not willing to meet. (Filing 34-1, Steele-Lufcy Decl. ¶ 80).[42]

83. Sometime between July 26 and July 28, 2016, Byer called Supervisor Steele-Lufcy about another incident with Ms. Luther and said that he could not take it anymore. Just after Supervisor Steele-Lufcy hung up with Byer, Ms. Luther called her and complained about Byer. (Filing 34-1, Steele-Lufcy Decl. ¶ 81).

84. Supervisor Steele-Lufcy discussed the most recent conflict with Ms. Rodysill. In response to the history between Byer and Ms. Luther, and because Byer was expressing concerns about his safety and Ms. Luther's continuing actions and statements to him, Supervisor Steele-Lufcy decided to direct both Byer and Ms. Luther that they were only to limit contact with each other to business-related issues only. (Filing 34-1, Steele-Lufcy Decl. ¶ 82).[43]

85. On July 29, 2016, Supervisor Steele-Lufcy issued Byer a Notice to Limit Work Place Interactions with Co-Worker (Rebecca Luther) to Only Required Work Related Topics and Issues. The Notice directed Byer to limit his work place interactions with Ms. Luther

---

[42] Byer states SMF 82 or SMF 83 are "[u]ndisputed," but he again references his deposition testimony which was cited in response to SMF 76. (Filing 38, pp. 32-33)

[43] Byer states SMF 84 is "[u]ndisputed as to the actions taken by Steele-Lufcy." (Filing 38, p. 33) Because Byer does not cite any contradictory evidence, SMF is deemed admitted in its entirety.

(including phone conversations, face-to-face interactions, written correspondence, text messages, IM messages, emails, etc.) to only those matters relative to the performance of his duties. The notice informed Byer that disciplinary action could result if he failed to adhere to the directives outlined in the memorandum. The notice did not remove Byer's responsibility to continue to meet with and work in physical proximity with Ms. Luther as needed to execute the duties of his position. The notice remained in effect indefinitely. Byer acknowledged receipt of this Notice by email. (Filing 34-1, Steele-Lufcy Decl. ¶ 83 & Attch. K).

86. On August 1, 2016, Supervisor Steele-Lufcy issued to Ms. Luther a Notice to Limit Work Place Interactions with Co-Worker (Roger Byer) to Only Required Work Related Topics and Issues. The directives issued in the notice were the same as the directives issued in the notice to Byer. Ms. Luther acknowledged receipt of this notice by her signature on August 2, 2016. (Filing 34-1, Steele-Lufcy Decl. ¶ 84 & Attch. L).

87. The notices issued to Byer and Ms. Luther did not affect their title, salary, benefits, status, or job responsibilities. (Filing 34-1, Steele-Lufcy Decl. ¶ 85).[44]

88. Supervisor Steele-Lufcy had not issued this type of notices to other employees because she only had this extensive level of conflict between Byer and Ms. Luther. (Filing 34-1, Steele-Lufcy Decl. ¶ 86).[45]

---

[44] In response, Byer claims that "Steele-Lufcy intended to use the cease and desist memo as a cover up of her efforts to provoke issues between Luther and Mr. Byer, as well as issues between Mr. Byer and the rest of his co-workers." (Filing 38, p. 34) He cites his own deposition testimony in which he states he called Steele-Lufcy before the "cease and desist memo" was issued and asked her, "What is this I hear you're telling Rebecca and me the same things against each other going?" and "[s]he wouldn't talk no more." (Filing 37-2, p. 64 (Byer Dep. 254:2-5)) This testimony does not directly support Byer's "cover up" claim, which is speculation, and does not refute SMF 87 in any way.

[45] Byer disputes SMF 88 by again incorporating his response to SMF 76. Such response does not contradict SMF 88.

## H. Byer's EEO Contact and Complaint Processing

89. On June 17, 2016, Byer made an informal complaint of discrimination with the VA's Office of Resolution Management (ORM). This complaint was designated VA No. 200J-0334-2016104140. (Filing 34-3, Wagner Decl. Attch. A., Byer Depo Ex. 31).

90. On June 26, 2016, Byer submitted information for his informal complaint of discrimination. In this document, Byer requested a "job modification or accommodation to limit face to face interaction with Rebecca (Luther)." (Filing 34-3, Wagner Decl. Attch. A., Byer Depo. 162:8 - 164:10 & Ex. 17, p. 2).

91. On September 19, 2016, Byer signed a formal Complaint of Employment Discrimination. (Filing 8, ¶ 35; Filing 34-3, Wagner Decl. Attch. A, Byer Depo. Ex. 31).

## I. Miscellaneous

92. Since Byer submitted his discrimination complaint [in] 2016, his salary has increased and his benefits, including insurance, retirement, and 401K, have not decreased. (Filing 34-3, Wagner Decl. Attch. A, Byer Depo. 40:8-14; 47:5-13).

93. Supervisor Steele-Lufcy was aware that Byer had some service connected disabilities. (Filing 34-1, Steele-Lufcy Decl. ¶ 13).[46]

94. None of the actions Supervisor Steele-Lufcy took with regard to Byer were based on his sex, age, [or] disability. (Filing 34-1, Steele-Lufcy Decl. ¶ 87).[47]

---

[46] Steele-Lufcy further states she "was unaware of what specific disabilities he suffered." (SMF 93) However, Byer testified he "let her know about my disabilities" on a trip to Grand Island "shortly after her arrival here." (Filing 38, p. 36; Filing 37-2, p. 19 (Byer Dep 75:1-22))

[47] Defendant's SMF 94 also states that Steele-Lufcy's actions were not taken because Byer "engaged in equal employment opportunity ('EEO') activity." (Filing 35, p. 22) Byer disputes this statement by claiming that his "work was scrutinized more closely and his job responsibilities increased after he filed his EEO claim." (Filing 38, p. 36). Although Byer cites no supporting evidence for this statement, his responses to SMF's 34 and 37 include

## III. STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *See Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the burden of showing there are no genuine issues of material fact. *See Celotex*, 477 U.S. at 322. This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.,* at 325; *see* Fed. R. Civ. P. 56(c).

"The nonmoving party must then come forward with specific facts showing that there is a genuine issue for trial, either by citing to parts of the record showing that there is a genuine dispute for trial or by demonstrating that the moving party has not established the absence of a genuine dispute or cannot produce admissible evidence supporting the absence of a dispute." *United States v. STABL, Inc.*, 800 F.3d 476, 483 (8th Cir. 2015) (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643

---

claims that his work was scrutinized more closely, and that he was required to travel more, after he returned from FMLA leave about a month after filing the EEOC complaint.

F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## IV. DISCUSSION

To survive a motion for summary judgment with a Title VII claim, a plaintiff must show either direct evidence of a Title VII violation or create an inference of discrimination or retaliation under the *McDonnell Douglas* burden-shifting framework.[48] *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015).

Direct evidence of discrimination requires "a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Id.* (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (alteration in original). "Direct evidence includes 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor.'" *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007) (quoting *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006)).

In the absence of direct evidence, the *McDonnell Douglas* framework applies, which requires a plaintiff to make a prima facie case of discrimination or retaliation. *Shirrell*, 793 F.3d at 887. If a plaintiff satisfies this burden, the defendant then has the burden of showing a legitimate, non-discriminatory reason for the challenged action. *Id.* If the defendant offers such a reason, the burden shifts back to the plaintiff to show the defendant's proffered reason is a pretext. *Id.* Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact. *Torgerson*, 643 F.3d at 1046.

---

[48] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

ADEA and Rehabilitation Act claims are analyzed in the same manner as Title VII claims.[49] *See, e.g., Hutson v. McDonnell Douglas Corp.*, 63 F .3d 771, 776 (8th Cir. 1995) (ADEA); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (Rehabilitation Act), *abrogated on other grounds by Torgerson*, 643 F.3d at 1031.

In this case, Byer has presented no direct evidence of discrimination, whether based on his age, sex, or disability, and no direct evidence of retaliation. All of his claims therefore must be analyzed using the *McDonnell Douglas* burden-shifting framework.

## A. Discrimination Claims

### 1. *Byer Cannot Establish a Prima Facie Case of Discrimination*

To establish a prima facie case of employment discrimination under the ADEA, a plaintiff must show (1) he is over 40, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) substantially younger, similarly situated employees were treated more favorably." *Faulkner*, 906 F.3d at 734.

Byer was born in 1955, and Defendant does not contend he is unqualified for his position as the Employment Coordinator for the VR&E Division at the VA's Lincoln Regional Office. Defendant only argues that Byer cannot establish the third and fourth elements of his ADEA claim. (Filing 35, pp. 25-26)

---

[49] While the Eighth Circuit has "applied *McDonnell Douglas* to ADEA claims when addressing them along with other discrimination claims, it is unclear whether *McDonnell Douglas* technically applies to the ADEA because the ADEA has a 'but-for' causation standard rather than the mixed motives standard used in other statutes. It is clear, though, that a plaintiff who fails to meet the lower standard of Title VII ... necessarily fails to meet the ADEA's standard as well." *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794-95 (8th Cir. 2019). The Rehabilitation Act also has a "but-for" causation standard. *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 n. 5 (8th Cir. 1999) ("Rehabilitation Act claims are analyzed in a manner similar to ADA claims except that the Rehabilitation Act imposes a requirement that a person's disability serve as the *sole* impetus for a defendant's adverse action against the plaintiff.") (emphasis in original); 29 U.S.C. § 794(a).

To establish a prima facie case of employment discrimination under Title VII, "a plaintiff must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Faulkner v. Douglas Cty. Nebraska*, 906 F.3d 728, 732 (8th Cir. 2018).

For purposes of the pending motion for summary judgment, "Defendant does not challenge Byer's membership in a protected group." (Filing 35, p. 26) And while Byer's job performance is certainly relevant to Byer's claim that his supervisor subjected him to "hyper-monitoring and surveillance," Defendant only argues that Byer cannot establish a prima facie case of sex discrimination because he did not suffer an adverse employment action and was not treated differently from similarly situated female employees. (Filing 35, pp. 25-36)

To establish a prima facie case of employment discrimination under the Rehabilitation Act, Byer must show that: (1) he was disabled, (2) he was qualified to do the essential job function with or without reasonable accommodation, and (3) he suffered an adverse action due to his disability. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016).[50]

Defendant does not dispute that Byer was disabled or that he was qualified for his employment position. Defendant only argues that Byer cannot establish the third element of his disability discrimination claim. (Filing 35, pp. 25-26)

---

[50] "Discrimination under ... the Rehabilitation Act encompasses both disparate treatment because of a disability and failure to provide reasonable accommodations to a qualified individual's known disability." *Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014). "The former requires proof of discriminatory intent, while the latter does not." *Id.* Byer only claims disparate treatment, although the amended complaint indicates Byer "requested a meeting with Steele-Lufcy and asked her about an accommodation." (Filing p. 7, ¶ 25) Byer testified at his deposition that after returning from FMLA leave, he asked either to be allowed to telework two days a week or to work fewer hours. The telework request was granted, and Byer withdrew his request for part-time employment. (Filing 37-2, pp. 36-39 (Byer Dep 144:23-152:5)

An adverse employment action is a "tangible change in working conditions that produces a material employment disadvantage." *Jones v. City of St. Louis*, 825 F.3d 476, 480 (8th Cir. 2016).[51] "This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Id.* "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Wilkie v. Dep't of Health & Human Services*, 638 F.3d 944, 955 (8th Cir. 2011) (citation omitted). Merely being unhappy with employment changes is not enough to constitute an adverse employment action. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016). "Petty slights and minor annoyances in the workplace, as well as personality conflicts and snubs by co-workers, are not actionable." *Sutherland v. Missouri Dep't of Corrections*, 580 F.3d 748, 752 (8th Cir. 2009).

*i. April 28, 2016 Team Meeting*

Byer first complains about the April 28, 2016 team meeting, where he and one of the counselors, Rebecca Luther, got into a heated discussion about file handling. Byer criticizes his supervisor for allowing this discussion to occur when he was unprepared, and for not "speaking up" during the meeting.[52] Byer was not disciplined as a result of this meeting, and

---

[51] Byer argues this is not the correct standard, and cites an Eleventh Circuit decision, *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998). (Filing 38, p. 36) That decision, however, involved a Title VII retaliation claim. As will be discussed subsequently, the Eighth Circuit has applied a different standard to retaliation claims since the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) (resolving circuit split).

[52] Byer also alleges that his supervisor, Melissa Steele-Lufcy, phoned him as he was driving home afterwards to ask him "to return to a meeting point and pick up credentials forgotten by one of his co-workers," and that he agreed even though "Steele-Lufcy had informed [him] the two co-workers he was delivering the forgotten credential to were 'out to get him.'" (Filing 8, p. 6, ¶ 19) This request also was not an adverse employment action. Byer testified that the credentials belonged to Anna Sabina-Stratton, and that he arranged to

it did not affect his title, salary, benefits, status, or job responsibilities. (SMF 28) While Byer contends he was so affected by the meeting that his doctor recommended six weeks off work, an employee's use of leave time is not an adverse employment action. *See Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 805 (8th Cir. 2013) ("[R]ather than an adverse action, the favorable employment benefits ... afforded by the State of Iowa to Jackman allowed her to take a substantial amount of leave instead of requiring her to quit her job).

### ii. Misclassification of Byer's Leave

Byer further alleges that "the VA timekeeper failed to classify his time [off] as FMLA leave" (Filing 8, p. 6, ¶ 24), but it is undisputed that the error was corrected and Byer suffered no harm. (SMF 29-33) *See Freelain v. Village of Oak Park*, No. 13 CV 3682, 2016 WL 6524908, at *5 (N.D. Ill. Nov. 3, 2016) (finding no adverse action where defendant mistakenly classified plaintiff's absences as "self sick," but subsequently corrected the errors), *aff'd sub nom. Freelain v. Vill. of Oak Park*, 888 F.3d 895 (7th Cir. 2018); *Formella v. Brennan*, 817 F.3d 503, 516, n. 2 (7th Cir. 2016) (finding no adverse action where defendant marked plaintiff absent without leave, but the timekeeping errors were corrected and plaintiff received payment for that time); *Dressler v. New York City Dep't of Educ.*, No. 10 CIV. 3769 JPO, 2012 WL 1038600, at *8 (S.D. N.Y. Mar. 29, 2012) ("A corrected administrative error without attendant deleterious effect does not constitute an adverse employment action.").

### iii. Required Travel after Return from FMLA Leave

Byer also complains that after returning to work from FMLA leave, he "was ordered to travel to western Nebraska, southern Nebraska, and elsewhere in addition to all the accumulated work during his six (6) week absence." (Filing 8, p. 6, ¶ 23) This was not an adverse employment action. As the sole Employment Coordinator for Nebraska, Byer's job duties required travel to meet with veterans, training facilities, employers, and organizations to explain the VA employment-related programs and help veterans find work or get work

---

meet her and Rebecca Luther at a convenience store; the encounter was brief and there was no discussion. (Filing 37-2, pp. 28-29 (Byer Dep 111:9-114:15)

experience. Supervisor Steele-Lufcy worked on Byer's cases during his absence, but she left Byer the case files where the National STAR Team had identified fiscal errors in his office so that Byer could correct his errors or at least learn from them. About a month after Byer returned from his FMLA leave, he traveled for an outreach activity in Kearney and also traveled to meet a Veteran at his job site in the Omaha area. Byer received compensatory time for the travel time outside of his work hours. This work, including travel, was clearly part of Byer's job duties to provide employment services to veterans. Byer never told his supervisor that he was unable to travel, nor did his paperwork preclude travel after his FMLA leave. (SMF 34-42)

Byer correctly points out that an increased workload that materially changes an employee's duties can constitute an adverse employment action. (Filing 38, pp. 36-37 (citing *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016); *Sellers v. Deere & Co.*, 791 F.3d 938, 944 (8th Cir. 2015)). The Eighth Circuit in *Kelleher* found that the employee did not experience an adverse employment action despite being switched from a stocker to a cashier because the cashier position did not materially change the terms or conditions of her employment. 817 F.3d at 631. In *Sellers*, the increase in the plaintiff's workload was significant—the employee was required to begin supervising three employees, took over job responsibilities of another employee out on sick leave, was delegated additional projects and given tasks at the last minute, and his part-time employee assistant was reassigned. 791 F.3d at 944. Even with these significant workload increases, the Eighth Circuit found no adverse employment action because the additional job duties did not constitute a material change in the terms and conditions of the position. *Id.* In Byer's case, none of the acts complained of resulted in an increased workload, let alone one that materially changed the terms and conditions of his position as the Employment Coordinator.

### iv. July 8, 2016 Leave Without Pay

Byer alleges he was forced to take leave without pay ("LWOP") in lieu of advanced annual or sick leave on July 8, 2016. (Filing 8, ¶¶ 29-30) However, Byer's leave records establish that Byer requested and took two hours of paid FMLA sick leave, not LWOP, on July 8, 2016. Steele-Lufcy testified that, as a manager, she does not require anyone to take LWOP, but she has granted LWOP requests made by employees. Byer did not request or receive LWOP on July 8, 2016. He requested 2 hours of sick leave and received 2 hours of

sick leave. Even if Byer had requested advanced leave for July 8, 2016, it would have been denied because an employee is not allowed advanced leave until his or her leave balances are depleted. Byer had both sick leave and annual leave balances after he returned from his 6-week FMLA absence, so he was not eligible for advanced leave. (SMF 49-55)

*v. July 26, 2016 Counseling Memorandum*

Byer claims discrimination because of a counseling memo he was issued on July 26, 2016, notifying him that his quality of work was unacceptable. (Filing 8, ¶¶ 31, 38) As an Employment Coordinator, Byer was required to meet the National Performance Standards for his position, including the critical element of Quality of Work. (SMF 56-58) The Letter of Counseling notified Byer that his performance for the period was 5.8 percent below the National Performance Standard for Fiscal Accuracy. (SMF 69) Byer does not dispute the accuracy of the analysis. (SMF 70) This does not constitute an adverse action.

"A reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse." *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1058 (8th Cir. 2007) (finding that plaintiff could not make out a prima facie case of discrimination because the terms and conditions of the plaintiff's employment were not affected); *see also Singletary v. Missouri Dep't of Corr.*, 423 F.3d 886, 891 (8th Cir. 2005) (finding no adverse action where employee placed on administrative leave pending investigation maintained his pay, grade, and benefits and, once the investigation concluded, was promptly returned to his original position); *Burchett v. Target Corp.*, 340 F.3d 510, 518 (8th Cir. 2003) (finding that "negative performance review is not in itself an adverse employment action," unless "the employer subsequently uses that review to alter the terms or conditions of employment to the detriment of the employee.").

In the present case, the Letter of Counseling does not constitute and adverse action because it did not affect Byer's title, salary, benefits, status, or job responsibilities. Byer was not placed on a Performance Improvement Plan ("PIP"). Instead, the Letter of Counseling was beneficial because it helped Byer improve his performance and meet the National Performance Standard by the end of the rating period, so he was rated Fully Successful. (SMF 74-75).

*vi. July 29, 2016 Notice To Limit Workplace Interactions With Co-Worker*

Finally, Byer alleges discrimination through a so-called "cease and desist" letter issued on July 29, 2016, which limited his interaction with Rebecca Luther. (Filing 8, ¶¶ 33, 38). Luther was issued the same Notice to Limit Work Place Interactions with Co-Worker on August 1, 2016. (SMF 86) The Notices directed Byer and Luther to limit their work place interactions with each other to only those matters relative to the performance of their duties. (SMF 85). The Notice did not adversely affect Byer's title, salary, benefits, status, or job responsibilities. (SMF 87) This was not an adverse employment action.

*b. Byer Was Not Treated Differently Than Similarly Situated Employees*

To create an inference of discrimination based upon disparate treatment, the plaintiff must show he was treated differently than similarly situated persons who were not members of the protected class. *Faulkner*, 906 F.3d at 732. "[T]he test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019) (quoting *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (2014) (en banc)). The plaintiff must establish "that he and the employees outside of his protected group were similarly situated in all relevant respects." *Id.* This means that the plaintiff and the potential comparators must have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.*

Byer alleges as part of his sex discrimination claim that "[t]he female employees supervised by Steele-Lufcy were not subjected to the same level of scrutiny and performance." (Filing 8, p. 12, ¶ 47) The evidence establishes this is not true. Steele-Lufcy conducted individual meetings with Byer and all of the Counselors on a weekly basis to review their cases and their performance standings. (SMF 60). She routinely issued a Letter of Counseling to any VR&E employee who was not meeting the National Performance Standards. (SMF 61). In 2016, Steele-Lufcy issued Letters of Counseling to three of the Counselors because their performance fell below their National Performance Standard measures. (SMF 64). In fact, she placed those three Counselors on PIP's, but she did not place Byer on a PIP because his performance improved after receiving the Letters of Counseling. (SMF 64, 74).

Byer also alleges he "was assigned extra work, principally involving travel, that female Vocational Rehabilitation counselors were generally not assigned." (Filing 8, p. 12, ¶ 47) However, Byer was the sole Employment Coordinator for Nebraska. The duties assigned to Byer were different from the duties assigned to the Counselors. (SMF 10, 11). Byer was required to travel around Nebraska as part of his job duties for Outreach activities and to meet Veterans and employers. (SMF 34). The Counselors were not required to travel to public information outreach or employment related events. (SMF 35). Because Byer and the Counselors were not similarly situated as to their travel requirements or their duties to veterans, no inference of discrimination arises.

Finally, Byer alleges that "Steele-Lufcy instigated conflict between Mr. Byer and his female co-workers," and "[h]e was disciplined thereafter and the female co-workers were not." (Filing 8, p. 12, ¶ 47) Presumably, this is a reference to the Notice to Limit Work Place Interactions with Co-Worker, as Byer alleges in connection with his retaliation claim that no other employee has been given a "cease and desist" order. (Filing 8, ¶¶ 58, 60). To the contrary, the undisputed evidence establishes that Rebecca Luther received the same directives as Byer instructing her to limit her interactions with Byer to only those matters relative to the performance of her official duties. (SMF 84-86). Steele-Lufcy has not issued such a Notice to any other employees because no other employees had the amount of conflict that existed between Byer and Luther. (SMF 88).

Defendant's unrefuted evidence that shows that Byer was not treated differently than similarly employees with respect to these alleged adverse employment actions. A plaintiff facing a summary judgment motion cannot "get to a jury without 'any significant probative evidence tending to support the complaint.'" *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 718 (8th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "To avoid summary judgment, the non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *Id.*

### 2. Defendant Has Offered Legitimate, Non-Discriminatory Reasons for Actions

"After a plaintiff makes a prima facie showing of liability, the employer must produce evidence that it had a legitimate, nondiscriminatory reason for its actions." *Eferebo v. Prime Therapeutics, LLC*, No. 8:09CV406, 2011 WL 13190195, at *2 (D. Neb. Mar. 15, 2011)

(quoting *Lyoch v. Anheuser-Busch Companies, Inc.*, 139 F.3d 612, 614 (8th Cir. 1998)). "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Torgerson*, 605 F.3d 584, 596 (8th Cir. 2010) (quoting *Floyd v. State of Mo. Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999)).

As already described in the statement of material of facts, Defendant has articulated legitimate, non-discriminatory reasons for having Byer rejoin the April 28, 2016 team meeting to discuss the counselors' concerns about files being returned to them, for requiring Byer to travel to Kearney for an outreach event on July 7, 2016, and to meet with a veteran at his job site in Omaha on July 8, 2016, for not allowing Byer to take advanced leave on July 8, 2016, for issuing a counseling memo on July 26, 2016, after Byer was determined not to be meeting the national performance standard for fiscal accuracy, and for issuing Byer a notice to limit his interactions Rebecca Luther on July 29, 2016.

Thus, even if Byer could make out a prima facie case of age, sex, or disability discrimination, he must additionally "show that the employer's actions were a pretext for discrimination." *Lyoch*, 139 F.3d at 614. To establish pretext, a plaintiff must "substantiate [his] allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Eferebo*, 2011 WL 13190195, at *2 (quoting *Putman*, 348 F.3d at 733-34).

### 3. Byer Cannot Establish Pretext

Byer has offered no evidence showing that Defendant's reasons for the actions he complains about were pretextual. Byer's subjective beliefs that he was discriminated against because of his age, sex, or disability are insufficient to show pretext. *See Wogou v. Omaha Pub. Power Dist.*, No. 8:10CV291, 2012 WL 1677420, at *6 (D. Neb. May 14, 2012); *see also Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 514, 516 (8th Cir. 2011) (stating standard of review and noting that to prove pretext, a plaintiff must show that employer's stated reason was false and that age was the real reason for the adverse employment action); *Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008) (holding that a showing of pretext requires more than merely discrediting the asserted reason for terminating an employee; circumstances must permit a reasonable inference of

discriminatory animus); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 917 (8th Cir.2006) (plaintiff's discrimination claim failed when her evidence of pretext was "entirely speculative").

### 4. Byer Was Not Subjected to a Hostile Work Environment

Byer alleges that "demeaning, disrespectful and harassing conduct by his female supervisor was a regular component of [his] day-to-day work environment," and that his "disabilities were exacerbated by the harassment he suffered at the hands of his co-workers and supervisor Steele-Lufcy." (Filing 8, pp. 11, 13, ¶¶ 44, 54) Although not alleged in his amended complaint, Byer also asserts in his brief that "throughout his employment Mr. Byer's co-workers always called [him] 'senior citizen,' (Byer Dep. 227:7- 228:22)." (Filing 38, p. 40) To the extent Byer is attempting to assert a hostile work environment claim, whether because of his age, sex, or disability, he has not demonstrated that there is a factual basis for such a claim.

"Hostile work environment harassment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016) (citing *Jackman*, 728 F.3d at 804). "This demanding standard requires extreme conduct rather than merely rude or unpleasant conduct." *Rester v. Stephens Media*, LLC, 739 F.3d 1127, 1131 (8th Cir. 2014) (internal quotations and citation omitted). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Blomker v. Jewell*, 831 F.3d 1051, 1057 (8th Cir. 2016).

To prevail on a hostile work environment claim, Byer must present evidence "that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment." *Moses v. Dassault Falcon Jet-Wilmington Corp*, 894 F.3d 911, 921-22 (8th Cir. 2018) (ADA and ADEA claims); *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) (Title VII claim). The final element includes both objective and subjective components: In order to show that the harassment affected a term or condition of

employment, "the conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of the victim's employment." *Hales v. Casey's Mktg. Co.*, 886 F.3d 730, 735 (8th Cir. 2018) (quoting *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997)). Courts are not required to delve into a plaintiff's personal background when assessing the objective severity of harassment. *Id.*, at 736 (holding district court did not abuse its discretion in excluding evidence of plaintiff's previous sexual assault and her related therapy as being irrelevant to her Title VII hostile work environment claim).

Byer must show that he was "singled out" because of his gender, age, or disability. *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 567 (8th Cir. 2000). There is no competent evidence to show that the alleged harassment by Byer's supervisor, Steele-Lufcy, or his co-worker, Rebecca Luther, was motivated by discriminatory animus. Byer testified there were no comments made by any of his co-workers to indicate that his gender was the basis for their disagreements, and no comments by Steele-Lufcy to indicate that his gender was the reason she was scrutinizing his performance or ordering him to have no contact with Luther. (Filing 37-2, p. 58 (Byer Dep 230:9-231:2)) Byer could only speculate that gender may have been a factor "[b]ecause [he] was a male in a more female-dominant environment." (*Id.* (Byer Dep 230: 3-8)) Byer mentioned during his deposition that his co-workers would call him "senior citizen," but said this was done "[i]n gist," and admitted, "I even call myself a senior citizen." [53] (*Id.*, at p. 57 (Byer Dep 227:1-228:1)) An employee's admission that conduct was not abusive is fatal to the employee's workplace harassment claim. *See Mahler*, 931 F.3d at 807 (citing *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047-48 (8th Cir. 2005)). With respect to his disability, Byer testified, "it seemed like everything was used in that perspective of the things that really annoyed me to make me feel bad or ashamed or feel not a part of." (Filing 37-2, p. 58 (Byer Dep 232:11-22)) Again, this is only speculation and conjecture, which is not sufficient to create a material issue of fact concerning whether he was subjected to workplace harassment because of his membership in a protected class. *See Palesch*, 233 F.3d at 567-68; *Kneibert v. Thomson Newspapers, Mich., Inc.*, 129 F.3d 444, 455 (8th Cir.1997) (party opposing summary judgment must

---

[53] At the time of the events alleged in his amended complaint, Byer was 61 years of age and three of the six counselors were 58 or 60 years of age. (SMF # 8)

provide sufficient probative evidence to permit a verdict in its favor rather than relying on conjecture and speculation).

Even if there were sufficient evidence that the alleged harassment resulted from Byer's membership in a protected class, the offending conduct, when considered altogether, did not rise to the level of severity required to support a hostile work environment claim. "To decide whether a work environment is objectively offensive, [the court] examine[s] all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *See Clay v. Credit Bureau Enterprises, Inc.*, 754 F.3d 535, 541 (8th Cir. 2014) (quoting *Singletary*, 423 F.3d at 892-93) A reasonable person would not perceive Byer's work environment as hostile. *See id.* (African-American employee was not subjected to sufficiently severe or pervasive race-based harassment based on 30 alleged incidents, including racially derogatory comments, and disparate discipline, to support hostile work environment claim).

## B. Retaliation Claim

### 1. Byer Cannot Establish a Prima Facie Case of Retaliation

Byer claims that after contacting the EO Office on June 17, 2016, and making a charge against his co-worker, Rebecca Luther, he was retaliated against when the VA issued him a letter of warning on July 26, 2016,[54] followed by a "cease and desist" order on July 29, 2016. (Filing 8, p. 14, ¶¶ 59, 60).[55]

---

[54] There were, in fact, three Letters of Counseling issued to Byer: on July 14, July 26, and September 23, 2016. (SMF 67, 69, 71)

[55] In the amended complaint, Byer also claims retaliation when his supervisor, knowing of his disabilities, "sent him into a confrontational meeting where other co-workers were attacking him." (*Id.*, ¶ 61). The only evidence of such a meeting, however, is the team meeting that took place on April 28, 2016. Byer admits that "[a]t the time of the April 2016 Team Meeting, Byer had not engaged in any protected activity and, therefore Supervisor Steele-Lufcy could not have retaliated against him." (Filing 38, p. 42)

To establish a prima facie case of retaliation, Byer must show that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse action, and (3) there was a causal connection between the adverse action and the protected activity. *Bunch v. Univ. of Arkansas Bd. of Trustees*, 863 F.3d 1062, 1069 (8th Cir. 2017) (Title VII retaliation); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007) (ADEA and ADA retaliation). Defendant does not dispute that Byer engaged in a protected activity by making an informal complaint of discrimination on June 17, 2016, but argues that Byer cannot prove the second and third elements. (Filing 35, p. 37)

*a. Byer Did Not Suffer an Adverse Employment Action*

Prior to the Supreme Court's 2006 *Burlington Northern* decision, the Eighth Circuit took a relatively restrictive approach to the phrase "adverse employment action," holding that there needed to be "tangible change[s] in duties or working conditions that constituted a material employment disadvantage." *AuBuchon v. Geithner*, 743 F.3d 638, 642 (8th Cir. 2014) (quoting *Manning v. Metro. Life Ins. Co., Inc.*, 127 F.3d 686, 692 (8th Cir.1997)). In its *Burlington Northern* decision, the Supreme Court characterized this standard as the "ultimate employment decision" standard, limiting retaliatory conduct to acts like "hiring, granting leave, discharging, promoting, and compensating." 548 U.S. at 60 (quotations, alterations, and citations omitted). The *Burlington Northern* Court articulated a new objective standard for determining what constitutes an "adverse employment action." *Id.* at 68. The Court held that an employee demonstrating an adverse employment action must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67 (quotations and citations omitted).

"[A]n adverse employment action must be material, not trivial." *AuBuchon*, 743 F.3d at 644 (citing *Burlington Northern*, 548 U.S. at 68). The Eighth Circuit has held that "[t]o avoid the triviality pitfall, the retaliation must produce some 'injury or harm.'" *Id.* (quoting *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009)).

> As a result, we have determined that commencing performance evaluations, sending critical letters that threatened discipline, falsely reporting poor performance, and failing to mentor and supervise employees did not establish a prima facie case of retaliation absent materially adverse consequences to the

employee. [*Littleton*, 568 F.3d at 644] (collecting cases). In other post-*Burlington Northern* cases, we have determined as a matter of law that certain employer actions were not materially adverse because they did not result in sufficient "injury or harm" to the employee in question. *See Lisdahl* [*v. Mayo Found.*, 633 F.3d 712, 721-22 (8th Cir. 2011)] (threats pertaining to job security, denial of vacation time, and public ridicule); *Sutherland v. Mo. Dept. of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009) (reclassification of performance from "highly successful" to "successful" not accompanied by reduction in pay, salary, benefits, or prestige); *Recio v. Creighton Univ.*, 521 F.3d 934, 939-40 (8th Cir. 2008) (extended duration of employer-mandated counseling, failure to notify of job vacancy, changes in work schedule, denial of opportunity to teach certain classes, maintenance of cold temperature in office, and faculty shunning); *Gilbert* [*v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 917-18 (8th Cir. 2007) (demotion of provost for plagiarizing, letter directing provost to improve performance, prevention of selecting guest speaker, and assignment to open cubicle); *Clegg v. Ark. Dept. of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007) (failure to provide training and orientation, denying access to work tools, failure to reinstate to prior position, addition of negative reports and reprimands to personnel file, exclusion from meetings, and denial of training). Importantly, we have also determined that a supervisor's warnings that "did not threaten termination or any other employment-related harm" do not constitute material adverse employment action. *Hill v. City of Pine Bluff, Ark.*, 696 F.3d 709, 715 (8th Cir.2012).

*Id.* In *AuBuchon*, the Eighth Circuit determined that while a supervisor's warnings to the plaintiff about not engaging in sexual harassment "were reckless and inconsiderate, they ... did not result in sufficient 'injury or harm' because he never 'threaten[ed] termination or any other employment-related harm.'" *Id.* (quoting *Hill*, 696 F.3d at 715). The Court also found the plaintiff's other complaints about accelerated work deadlines, extra work assignments, and insufficient performance reviews, "whether considered individually or collectively, fail to rise to the level of unlawful retaliation because they constitute 'petty slights or minor annoyances that often take place at work and that all employees experience.'" *Id.* at 645 (quoting *Burlington Northern*, 548 U.S. at 68).

A reasonable employee would not have found the Letters of Counseling or the Notice to Limit Interactions with Co-Worker to be materially adverse actions. Neither of these actions caused any "injury or harm" to Byer. In fact, the Letter of Counseling proved beneficial because Byer's performance improved thereafter, allowing him to be rated as

"fully successful" on his 2016 annual review. (SMF 75) Byer received an increase in salary and no decrease in benefits. (SMF 92) While Byer claims to have been "stressed" by the Letter of Counseling, his three co-workers who also received Letters of Counseling around the same time (SMF 64) undoubtedly felt the same. The so-called "cease and desist" order of July 29, 2016, was not a disciplinary action, but was consistent with a request Byer submitted on June 26, 2016, in connection with his informal discrimination charge, that he receive a "job modification or accommodation to limit face to face interaction with Rebecca (Luther)." (SMF 90)

### b. There Was No Causal Connection

To establish a causal connection, Byer must prove that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII). The ADEA and the Rehabilitation Act (applying ADA principles) likewise require a showing of "but-for" causation. *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) (ADEA); *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 412 (8th Cir. 2018) (ADA). It is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision. *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016).[56]

Byer cannot show that the Letter of Counseling would not have been issued in the absence of Byer's protected activity. It is undisputed that Supervisor Steele-Lufcy had an individual meeting with each of the Counselors and with Byer on a weekly basis during 2016 to review their cases and their performance standings, and that she routinely issued Letters of Counseling to employees who were not meeting the National Performance Standard for fiscal accuracy or other measurement. (SMF 60, 61). It is also undisputed that Byer was not meeting the National Performance Standard on each of the dates he was issued a Letter of Counseling. (SMF 67, 69, 71)

_____

[56] The Eighth Circuit applies "the familiar *McDonald Douglas* burden-shifting analysis even when the applicable standard of proof requires a showing of but-for causation." *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th Cir. 2017); *see Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 888 (8th Cir. 2015) (applying the *McDonnell Douglas* framework to a Title VII retaliation claim using the but-for standard articulated in *Nassar*.).

Similarly, Byer cannot show that the Notice to Limit Interactions with Co-Worker would not have been issued if he had not made a charge of discrimination against Rebecca Luther on June 17, 2016. The evidence shows that Byer and Luther had a history of personality conflicts. (SMF 76) Steele-Lufcy had tried a number of ways to resolve their conflict, including holding the discussion at the April 28, 2016 team meeting, meeting with Byer and Luther jointly and individually, and responding to emails and phone calls from Byer and Luther in which they complained about the other person. (SMF 77). Steele-Lufcy also offered to mediate on several occasions, but Byer refused. (SMF 78) On July 12, 2016, Byer contacted Steele-Lufcy to complain that Luther had come to his office and was verbally aggressive. (SMF 81) On or about July 22, 2016, and in emails over the next few days, Steele-Lufcy again offered to mediate a meeting to address the conflicts between Byer and Luther, but Byer was not willing to meet. (SMF 82) Sometime between July 26 and July 28, 2016, Byer called Steele-Lufcy about another incident with Luther, saying he "could not take it anymore." This was followed immediately by a call from Luther complaining about Byer (SMF 83) It was at this point in time that Steele-Lufcy, in consultation with Human Resources, decided to limit Byer's and Luther's contact with each other to work-related matters. (SMF 84)

"Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999) (en banc)). While plaintiffs may use circumstantial evidence to prove causation, "[t]he more time that elapses between the two events ... the weaker the inference of causation." *Jensen v. IOC Black Hawk Cty. Inc.*, 745 F. App'x 651, 654 (8th Cir. 2018) (quoting *Robinson v. Am. Red Cross*, 753 F.3d 749, 756 (8th Cir. 2014)). "In such cases a plaintiff must present additional evidence of a causal link, which can include 'escalating adverse and retaliatory action.'" *Id.* (quoting *Robinson*, 753 F.3d at 756). In the present case, as in *Jensen*, there is no such evidence; "the record only indicates that management attempted to de-escalate any hostility among employees that arose from [the plaintiff's] complaint" of discrimination against a co-worker. *Id.* (affirming district court's grant of summary judgment in favor of employer). *See also Brunckhorst v. City of Oak Park Heights,* 914 F.3d 1177, 1184-85 (8th Cir. 2019) ("Even if Brunckhorst had not complained of discrimination until [five days before his termination], a temporal connection by itself is not sufficient to establish a causal connection. Instead, the City proceeded to work

with Brunckhorst after that date. It did not terminate his employment until he continuously rejected the City's proposed accommodations and did not return to work. His retaliation claim thus fails.") (citation omitted).

### 2. Defendant Has Offered Legitimate, Non-Retaliatory Reasons for Actions

As outlined above, Byer's supervisor had legitimate, non-retaliatory reasons for issuing the Letters of Counseling and Notice to Limit Interactions with Co-Worker. Thus, even if Byer could establish a prima facie case of retaliation, by making a sufficient showing an adverse action and causation, to avoid summary judgment he must also demonstrate that the proffered reasons are pretextual. *See Mahler*, 931 F.3d at 805.

### 3. Byer Cannot Establish Pretext

"While the proof necessary to establish a prima face case is minimal, [Byer] must present 'more substantial evidence' to establish pretext because 'evidence of pretext ... is viewed in light of the employer's justification.'" *Id.* (quoting *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015)). Byer must "present evidence that (1) creates a question of fact as to whether [the employer]'s proffered reason was pretextual and (2) creates a reasonable inference that [the employer] acted in retaliation." *Lacey v. Norac, Inc.*, 932 F.3d 657, 660 (8th Cir. 2019) (quoting *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)). He must show that the employer's proffered reason was "unworthy of credence." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 860 (8th Cir. 2005) (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002)). Byer has failed to make such a showing.

Defendant's evidence establishes that Steele-Lufcy determined in late April or early May 2016 that Byer was not meeting the National Performance Standard for fiscal accuracy regarding EAA payments, and was prepared to issue a Letter of Counseling except for the fact that Byer was on FMLA leave from April 29 to June 10, 2016. (SMF 65, 66) That Byer filed a discrimination charge against Luther before the Letter of Counseling was issued is a "mere coincidence in timing." *Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 436–37 (8th Cir. 2016) (quoting *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)). Defendant's evidence also establishes that Steele-Lufcy's efforts at resolving the conflict between Byer and Luther pre-dated the discrimination charge, and that the "cease

and desist" order was issued within days after both employees again complained to her about one another's conduct. Byer even alleges in his amended complaint, and testified at his deposition, that Steele-Lufcy had encouraged him to file the EEO charge against Luther. (Filing 8, p. 14, ¶ 58; Filing 37-2, pp. 40-41 (Byer Dep 159:1-162:6)

## V. CONCLUSION

Byer cannot establish a prima facie case of discrimination or retaliation under Title VII, the ADEA, or the Rehabilitation Act. In addition, Defendant has offered legitimate, non-discriminatory and non-retaliatory reasons for the VA's actions, which Byer cannot show were pretexts for discrimination or retaliation.

Accordingly,

IT IS ORDERED:

1.    Defendant's motion for summary judgment (Filing 33) is granted, and Plaintiff's action is dismissed with prejudice.

2.    Judgment shall be entered by separate document.

DATED this 2nd day of October, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge